[No. 27549.   Department Two.   January 23, 1940.]

WALDO W. BURGIN *et al., Respondents,* v. UNIVERSAL CREDIT COMPANY *et al., Appellants.*[1]

[1]Reported in 98 P. (2d) 291.

*Smith & Matthews, J. Speed Smith,* and *Beverly S. Wilkerson,* for appellants.

*Vanderveer & Bassett, Thomas R. Stiger,* and *Clarence J. Coleman,* for respondents.

GERAGHTY, J. — The plaintiffs, husband and wife, sought recovery for personal injuries alleged to have been inflicted upon them by the defendants while forcibly and unlawfully attempting to repossess an automobile in the possession of the plaintiffs under a contract of conditional sale. Two causes of action are

set out in the complaint; one for injuries to the husband, a second for injuries sustained by the wife. A jury's verdict awarded the plaintiffs $6,560 for injuries sustained by the husband, as alleged in the first cause of action, and made no award of damages on account of injuries alleged to have been sustained by the wife. After the denial of motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, judgment was entered upon the verdict in favor of the plaintiffs, and the defendants appeal.

The respondents purchased a Ford car from the McFarland Motor Company of Seattle, in October, 1936, on a contract of conditional sale, containing the usual provisions for repossession in event of the vendees' failure to make the monthly payments stipulated in the contract. The contract was assigned by the vendor to the appellant Universal Credit Company. The respondents did not always make their payments promptly, and, August 4, 1937, three monthly installments were overdue. Friese, the credit company's field man, had been directed to collect the delinquent installments.

Called as an adverse witness by the respondents, Friese testified that, August 4th, he went to the Burgin home on a farm north of Marysville, in Snohomish county, and saw that the car was there, but did not speak to anyone. He returned to Everett and telephoned the Seattle office of the credit company to find out if any payments had been made on the car that day. He was informed that none had been made and was directed to repossess the car. He then arranged to have Robert Spurling, who maintained a garage on the main highway a short distance south of Everett, bring a wrecker to tow the car into Seattle. Finding, on returning with Spurling to the Burgin farm, that the car was not there, they returned to

Everett. Dismissing Spurling for the time being, Friese proceeded to look for the car and found it standing on a dock near the water front. We quote from the abstract his version of what occurred thereafter.

"I looked over the automobile and saw no one in it, and called Mr. Spurling to come and assist me to pick it up and bring it in. Mr. Spurling came with his wrecker. . . . I pointed the car out to him. I got in the wrecker, and we drove in front of the car. I got out. . . . and Mr. Spurling was putting a chain on the car. It is necessary to put a chain on the front end before you can hoist them up. As he was putting this chain on,—I don't know how much he had it on, he had it fastened, but it wasn't completely fastened, and Mrs. Burgin came from somewheres, I don't know. She put on a scene, you might say—loud talking, and excited—and told us we couldn't take the car, and I told her we already had a chain on it and we were going to take it, it was going back. They were talking there—there was loud talking—and I didn't want any trouble, so I called the police . . . When I came out Mr. Burgin was there, and he carried on the same way his wife did, saying we couldn't take the car; we had to have a court order. . . . Then the police came. . . . I was there when the police told Spurling to fasten the chain that was already attached to the other car, to the wrecker, and Spurling hoisted the car up and hauled it away. Mr. and Mrs. Burgin were both in the car when the car was lifted up. The officer, the plainclothes man, told Mr. and Mrs. Burgin to get out of the car. I heard Spurling ask them, or tell them, to get out of the car. The policeman told Mr. and Mrs. Burgin, after asking me where I was going to take the car and I had said Seattle, 'If you don't want to ride to Seattle, you'd better get out.' "

Asked why he had called the police, Friese said:

"Mrs. Burgin was highly excited and a crowd of people were collecting around there, and it had all the aspects of a large crowd collecting there, and a

scene; and rather to avoid a scene or any trouble that might come, I wanted the police on hand."

Mrs. Burgin testified that she took care of the payments herself because her husband was not in position to do so. In the early afternoon of the 4th, she went to a bank in Everett, procured a certified check for one monthly installment (three installments were due) and took it to the postoffice to mail to the vendor, McFarland Motor Company, Seattle. She and her husband drove the car down to the dock. We quote from the abstract:

"I was sitting in the front seat at the time. My husband got out of the car and went in the machine shop there to get a pulley. While he was in Fisher's, the tobacco place, the wrecker drove up there. Of course, when it drove up there I didn't see it at first, until somebody came up alongside of the car and put their hand on the car and says, 'I'm taking this car.' At that time I didn't know who he was, but that same man is here now, Mr. Friese. I says, 'Oh, no, you aren't. I just put a payment in the mail,' and he says, 'Well, one payment won't do.' I says, 'I didn't say how many payments.' Then he disappeared. Then I noticed Spurling standing there with a chain in his hand, and I got out. I had been sharpening my pencil and I had my knife and pencil and purse in my hand, and I got out and I says, 'See here Bob, don't do that,' I says, 'You've got no right to take that car. I just fixed up one payment.' He says, 'I have orders to take it.' I says, 'It's not the right thing to do.' I didn't want him to put the chain on. Mr. Burgin came out at that time, so I hollered at him. My husband came over and he tried to get Bob not to put the chain on, and he pushed him aside; he told him 'to get out of there,' and he said something about if you didn't get away, and he told him his neck wasn't well yet, and he says, 'Be careful or I'll twist your neck.' . . . So Mr. Burgin got in the car and backed it away. I stood there, and then I ran up the street and got in the car when he stopped. My husband backed the car up the street

about a hundred feet . . . and there was a chain on the car at that time, he had succeeded in getting it on one bumper. The chain hadn't been attached to the wrecker then. I got in the car and he drove forward then, and by that time the cops were coming down, and he made the turn and Bob got in front of him then with the wrecker. . '. . Mr. Spurling put the chain on regardless of my efforts . . . After the chain was put on the car, the cops told us we were blocking traffic and we'd have to move out, so Mr. Spurling drove on up the street, up Hewitt Avenue, with the car. . . . The front end of the car was suspended. We went right up Hewitt, and it was very rough going up there. . . . When we got to the stop-light, I got out of the car."

The husband testified that, on returning to the car from a nearby store, he found his wife and Spurling in an argument and scuffling over the chain. Quoting from the abstract:

"I told him he couldn't take that car . . . and he said it didn't make any difference whether he had any papers or not, . . . he was going to take the car anyway and he went to put the chains on, and I just got in the car and drove it away, backed right up the street and got away from him. I then turned around and stopped possibly a hundred feet away from where I had originally stopped. . . . When I stopped and let my wife in, Spurling drove around in front of me with his wrecker so that I couldn't get away. A crowd of policemen came down on motorcycles, and they wanted to know what was going on there. . . . they told me to get out of the street, we were blocking the traffic. Then the wrecker hooked on to my car, they raised it up and took me up the street and took my wife with me. . . . I tried to keep Spurling from putting the chains on the car, and we got in a little mixup there, and he just took the heel of his hand and shoved me away . . . They hooked the wrecker on, took me out of the traffic and up to Hewitt Avenue to Rucker Avenue and stopped at the stop-light, and my wife jumped out there . . ."

In relation to his injuries, Burgin testified that, after his wife had left the car, the wrecker, with the Ford in tow, was driven south to Spurling's service station, where they stopped. Spurling then removed the brake pins on the car so the brakes could not be applied. Before reaching the station, Burgin had been thrown against the car door when the car went over a bump, and he couldn't remember anything thereafter until he reached the station. He was in considerable pain and asked Spurling and Friese to call an ambulance for him, but they refused, saying they would take him to his doctor in Seattle. About a mile and a half farther along the highway, they were stopped by a state patrolman, and, after some conversation between him and Friese, Spurling returned to Everett not over the main highway, but by the old highway, which was in part a gravel road.

Burgin testified that, after going on the gravel road, he fell over in the seat, "and I didn't know no more until we were down, coming in on some street there in Everett on the pavement." They stopped at the police station in Everett and then went on to Simpson's garage. Friese had followed them all the time in his car. When they got to Simpson's garage, Friese took the carburetor off the car so that he could not operate it. "I wouldn't have taken the machine anyway because I wasn't in a condition to drive the machine, and I told Mr. Simpson to hold the machine there for myself." After five or ten minutes, he left Simpson's garage and went to the store where he did his trading and called up his home to have someone come to get him.

Burgin testified that, in the fall of 1936 and spring of 1937, he had sustained injuries to his neck, which caused a swelling and inflammation so severe that he was taken to a doctor in the city of Everett. Later,

another doctor came to see him at his home, because he was unable to go to the city. He couldn't hold up his head, and the doctor prescribed an emergency brace. He was then examined by a doctor in Seattle, by whom he was thereafter treated. After two weeks of treatment, he began to feel better. His neck had improved to where he "was acting all right," and was able to get along without his brace and could do work on his farm, although he had not totally discarded the neck brace.

He testified that, since August 4, 1937, he had experienced pains in the neck and was taking aspirin for relief, with only partial success. It was impossible for him to get along without the brace, even when in bed. He was in bed for three months or more. He had been unable to do work since August 4th.

On cross-examination, it developed that, prior to the incident of August 4th, respondent had been injured three times in the same way, by the same person, and by the same means, namely, by the blow of a fist. "I was in my own home, and the person was not responsible for the act or deed that he committed." This testimony was received with the consent of counsel for the respondents after the court had sustained an objection to the questions propounded by counsel for appellants as being immaterial to the issues.

Spurling testified that, when, in response to the call from Friese, he drove to the dock, Friese pointed the Burgin car out to him and told him to pick it up. He backed the wrecker to within two feet of the car and got his chains out and proceeded to put one on the bumper bracket of the car. Quoting from the abstract:

"Just about the time that I got the chain fastened on, a woman came up and pushed on my left side and says, 'You can't hook on to my car,' and called me quite a few names. I just kind of looked up and grinned at

her a little bit. I says, 'I'm sorry, lady, I'm just work-
ing here. You'll have to argue with the other fellow.'
. . . Then she tried to pull the chains off the front
end of the V-8 after she got through arguing with him,
and I stood there and held the ring in my hand like
that (illustrating), and stood there, and she tried to
pull the chain off. Of course, she couldn't get it loose,
so she turned around and she ran over to Mr. Fisher's
place, a little coffee shop across the street; and while
she was doing that I went around and turned my drum
loose on the wrecker to get my cable so I could hook
into the chain that I had on the front end of the V-8,
and before I could get that loose and get back to my
chain, why Mr. Burgin came running across the street
with his hands out like this (illustrating), calling me
names and swinging at me. . . . And then he quit,
and run around and got into his car and started trying
to start it, stepping on the starter. And when he done
that I reached down and got a hold of the chain, and
then I tried to reach over and get a hold of the cable.
. . . she kicked at me pretty hard . . . By that
time Mr. Burgin got his car going, and he started back-
ing away, and I couldn't hang on to the chain. . . .
He drug my chain back up around there. When he
started up there I figured he was going to get up Hewitt
Avenue ahead of me, and I had an $8.00 chain hanging
on the end of that V-8, so I backed up in front of him
. . . so he couldn't pull up Hewitt Avenue."

By that time, the police, in response to the call of
Friese, appeared on the scene, as well as a large crowd
of spectators. Spurling attached the chain, which had
been wrapped around the bumper of the Ford car, to
his wrecker and proceeded to "jack" up the car so that
its front wheels were elevated about two feet ·from
the ground. The Burgins, who were sitting in the car,
put the brakes on. Spurling requested a policeman
to require him to release the brakes and put the car
out of gear. The officer declined, saying he had no
right to require them to do that, but ordered Spurling

to get the car out of the way of traffic if he had to "pull the wheels off."

The following instruction, No. 5, was given by the court:

"If the purchaser of an automobile under a conditional sales contract fails to make the payments required by such contract at the times therein specified and the seller, by the terms of the contract, is authorized in such event to repossess the automobile, the seller may repossess the same if he can do so peaceably; but if the buyer is in personal possession of the automobile and protests against such repossession and attempts to obstruct the seller in doing so, then under such circumstances, it becomes the duty of the seller to proceed no further in such attempted repossession and to resort to legal process to enforce his right of repossession given him by the contract. Under such contract the seller is not entitled to use force to repossess an automobile, and if he does, and in so doing, inflicts personal injuries upon the purchaser or party in lawful possession of the same, he is liable in damages for such injuries.

"In this connection I further instruct you that when such conditional sales contract is assigned by the seller to a finance company, the seller's rights and liabilities under the contract are transferred to and assumed by the finance company."

This instruction correctly stated the law and was not challenged by the appellants. In the light of the quoted testimony, it would be far-fetched to say that appellants' method of repossessing the car was peaceable. But appellants contend that Mrs. Burgin was out of the car when the chain was placed on its front bumper.

She testified that she was sitting in the car at the time and got out of it to resist Spurling's attempt to wrap the chain around the bumper. It is not claimed that, at this stage of the operation, the chain had been attached to the wrecker. The jury were entitled to

believe, and evidently did, her version of what took place. But whether Mrs. Burgin was sitting in the car or standing beside it was, we think, not material, because she at all times from the beginning resisted, and quite forcibly it would seem, Spurling's effort to wrap the chain around the bumper. Spurling had progressed with the repossession no further than throwing the chain over the bumper. This was no more a repossession in fact than if he had cast the chain into the car. The peaceable repossession authorized by law must be actual and not merely symbolic.

In *McClellan v. Gaston,* 18 Wash. 472, 51 Pac. 1062, quoted with approval in *Roberts v. Speck,* 169 Wash. 613, 14 P. (2d) 33, it is said:

"Because a party to a contract violates his contract and refuses to do what he agreed to do, is no reason why the other party to the contract should compel the performance of the contract by force. The adoption of such a rule would lead to a breach of the peace, and it is never the policy of the law to encourage a breach of the peace. The right to an enforcement of this part of the contract must, in the absence of a consent on the part of the mortgagor, be enforced by due process of law the same as any other contract."

And the court quoted a passage pertinent here, in view of the intervention, at the appellants' request, of the police, from Jones on Chattel Mortgages (4th ed.), § 705, as follows:

"The mortgagee becomes a trespasser by going upon the premises of the mortgagor, accompanied by a deputy sheriff who has no legal process, but claims to act *colore officii,* and taking possession without the active resistance of the mortgagor. To obtain possession under such a show and pretence of authority is to trifle with the obedience of citizens to the law and its officers."

In *Roberts v. Speck, supra,* the court says:

"The reason for the rule requiring a person to resort to process of law in undertaking to acquire possession of property to which he is entitled by virtue of a contract with the person in possession, when such party refuses to peaceably surrender it, is the same whether the possession be acquired by virtue of the terms of a chattel mortgage or a conditional bill of sale. The law does not encourage people to resort to a breach of the peace."

The appellants' next contention is that the respondent Waldo W. Burgin received his injuries, if any, as a result of his own negligence. This contention is based upon the fact that the respondent refused to leave his car after it had been attached to the wrecker.

The respondent had a right to obstruct the attempt of the appellants to forcibly repossess his car by all lawful and reasonable means. He may well have thought that his leaving the car would have been an acknowledgment of the appellants' repossession; furthermore, as we have seen, respondent testified that, when the wrecker arrived at Spurling's service station, some distance south of Everett, he requested Spurling to call an ambulance for him, but Spurling replied that they would take him to Seattle to his doctor. The question whether or not his remaining in the car under the circumstances was contributory negligence, was one of fact for the jury to determine.

The appellants cite *Geissler v. Geissler,* 96 Wash. 150, 164 Pac. 746, 166 Pac. 1119. In that case, an action had been brought by a husband and wife to recover for injuries to the wife, alleged to have been inflicted by the defendant in effecting repossession of a car purchased on a contract of conditional sale. The car was in the husband's garage when the vendor started to take it. The wife, who was present in the garage as

bookkeeper for her husband, undertook to prevent withdrawal of the car and was in the act of mounting the front seat when the defendant pushed her aside in order to take the front seat himself. She climbed to the rear seat and was carried to the home of the defendant, where the car was placed in his private garage. She refused to vacate the car and sat there an hour wrapped in the damp lap robe. When her husband arrived to take her away, she was in a fainting condition and had to be carried from one car to the other.

The jury returned a verdict of three thousand dollars in favor of the plaintiffs. The verdict was reduced by the trial court to two thousand dollars. On the defendant's appeal, this court held that, while the case was one for the jury, the amount awarded the plaintiffs, even after the reduction made by the lower court, was excessive, and remanded the case with instructions to grant a new trial unless the plaintiffs consented to a remission of $1,250 from the amount of the judgment.

In reducing the amount of the judgment, the court was influenced by the fact that the doctor summoned to attend the wife testified that, from his observations, she could not have been seriously injured; and, also, by the fact that, whatever her injury, it was contributed to by her own unjustified acts in stubbornly remaining in the car for an hour after it had been finally stored in the vendor's garage, attempting to ward off the cold by wrapping herself in a damp lap robe; in other words, whatever injury she sustained was largely contributed to by her own acts after repossession had been completed by storage of the car in the garage. The implication of the decision is that she was allowed $750 for the damage she sustained

in the forcible repossession of the car and her transportation in it to the vendor's garage.

The facts in the case before us are different from those in *Geissler v. Geissler.* Here, the injuries sustained by the respondent husband occurred during the process of repossession while he was rightfully occupying a seat in the car and before its delivery by the appellants for storage in Simpson's garage.

■ It is next urged that the court's instruction No. 12 embodied unlawful comments upon matters of fact in violation of Art. IV, § 16, of the state constitution. The first part of the instruction complained of follows:

"If you find a verdict for the plaintiff, Waldo W. Burgin, you will assess his damages in such amount as will fully and fairly compensate him for such impairment of his health and vigor, if any, as he has sustained in the past or is reasonably certain to sustain in the future *as a natural and proximate result of the defendants' wrongful acts,* for such physical pain, if any, as he has suffered in the past or is reasonably certain to suffer in the future *as a result of such wrongful acts;* also for such expense, if any, as he has reasonably and necessarily incurred in the past, or will with reasonable certainty be compelled to incur in the future for the services of physicians as a proximate result *of the defendants' wrongful acts.*"

The appellants' complaint is directed against the repeated references, which we have italicized, to "the defendants' wrongful acts."

We think the objection hypercritical. The jury could not have been misled by the instruction into the belief that the court assumed the appellants' acts to have been wrongful. The court having, in its previous instructions, informed the jury as to what would constitute wrongful acts entitling the respondents to a verdict, prefaced the challenged instruction with the hypothetical, "If you find a verdict for the plaintiff."

Of course, if the jury found a verdict for the respondent, it could be only on a finding of wrongful acts committed by the appellants as defined in the instructions.

Appellants also object to another portion of this instruction on the ground that it authorized the jury to assess damages for the expense of future medical services, since there was no evidence that such services would be required. The reference to future medical expenses in the instruction was as follows:

"In assessing . . . expenses to be incurred in the future for the services of physicians, I instruct you that you cannot indulge in speculation or uncertainties, but may award damages only for such matters as are reasonably certain to happen as disclosed by the evidence."

In *Webster v. Seattle, R. & S. R. Co.*, 42 Wash. 364, 85 Pac. 2, the court instructed the jury that they might take into consideration any expense for medicine or care by physicians which respondent had necessarily been put to by reason of such injuries, or that he may in the future, with reasonable probability, be put to by reason of such injuries. Commenting on the instruction, the court said:

"Appellant concedes that there was evidence to show medical attendance in the past, but contends that there was no evidence to show the value of physician's services prior to the trial, and no evidence that respondent would probably need such services in the future. . . . While there is no direct evidence in the record that respondent had paid for medical attendance in the past, yet there was abundant to show that he had employed, and was attended by, physicians, and that respondent had been severely injured and had not recovered at the time of the trial. . . . This evidence was sufficient to support the instruction, because when it was shown that respondent was in need of medical attendance and had employed physicians, the presumption followed that there was some ex-

pense attached to such employment; and when it was also shown that respondent would suffer in the future, it followed that in all probability he would need medical attention for which the jury were at liberty to fix a nominal sum at least. *Feeney v. Long Island R. Co.,* 116 N. Y. 375, 22 N. E. 402; *Gallamore v. Olympia,* 34 Wash. 379, 75 Pac. 978."

In *Anderson v. Hurley-Mason Co.,* 67 Wash. 342, 121 Pac. 815, Ann. Cas. 1913D, 148, objection was made to the following sentence contained in the trial court's instruction: " 'You may also include such reasonable sum as the evidence satisfies you he has heretofore been or may hereafter be called upon to expend for physicians and surgeons.' " This instruction was challenged on appeal; passing upon it, this court said:

"The instruction in this case limits the recovery to such reasonable sum as the evidence shows to have been expended. We think it may be fairly said of the instruction that it warned the jury that there could be no recovery for the items mentioned unless the evidence justified it."

While this language would seem to refer specifically to that part of the instruction having reference to medical expenses incurred in the past, it seems to have been assumed that the same rule would apply as to future medical expenses. In either case, there could be no recovery under the instruction unless the evidence justifies it. The same result would follow under the challenged instruction here. We think that, under the evidence, the jury could have found that the respondent would require future medical attention and was entitled to the award of a nominal sum, at least, for medical services.

It is next contended that the court erred in giving instruction No. 6, as follows:

"If you believe from the evidence that the plaintiffs, or either of them, were sitting in the automobile in

question and the defendants had it forcibly towed away, I instruct you that such towing away or attempted repossession would be wrongful and in violation of plaintiffs' rights, if it was done without legal process. Under such circumstances the plaintiffs would be justified in doing any act, reasonably intended, to prevent such attempted repossession; and, if in the course of such attempted repossession the defendants caused the plaintiffs or either of them to suffer personal injuries, your verdict will be for the plaintiffs."

The contention is that for the court to instruct the jury that, if the respondents were sitting in the automobile when it was towed away, the appellants' acts would then be wrongful, amounted to a direction to the jury to return a verdict in favor of the respondents, since it was conceded by everyone that the respondents were seated in the car when it was towed away, and the issue was whether the appellants had lawfully repossessed the car before the respondents entered it. The trial court, while conceding that this instruction may not have been happily worded, stated it could not have misled the jury, when read in connection with the other instructions given. In this, we agree with the court.

The present is the second trial of this cause. At the first trial, a verdict in favor of the plaintiffs was set aside by the court for error and a new trial granted. Near the close of the respondents' case at the present trial, the appellant Friese, who had previously been called as an adverse witness, was recalled for further examination by respondents. After admitting that he was present during the course of the former trial, he was asked by counsel for respondents:

"After the jury was empanelled and during the course of the trial did you attempt to talk to any of the jurors that were hearing that case, with the idea of influencing them, and rendering a verdict in your

favor and in favor of the company for whom you worked? 'Yes' or 'No.' "

Counsel for appellants interposed an objection to the question, and, after some discussion, the jury was excused. After further argument, the jury was recalled, and the court announced that, under the authority of the decisions cited to him, he would overrule the objection and permit counsel to inform the witness, when recalled, of his right to claim his privilege against self-incrimination. There was no objection from counsel to this suggestion. When the question was repeated to the witness, he answered, "No." Further examined, he testified:

"Q. You said something a minute ago, you were going to explain something. Did you talk to any of the jurors who were empanelled to try that case,— meaning the last trial of this lawsuit? . . . A. Yes, sir, I did. . . . Q. No one was talked to about the case during the trial? A. I talked to one of the jurors but not about the case, is that clear? . . . Q. What does he do, do you remember? . . . A. He is a man that runs an eating establishment out here on the highway. . . . Q. How many times did you talk to him while he was still sitting hearing your case? A. Why, I talked to him twice, I believe,— once before, and once after the trial. . . . Q. Did you talk to him during the trial, while he was sitting as these ladies and gentlemen are sitting there, during an intermission, in the evening? A. I merely sat in his place, and he served me just as anyone would. I was hungry coming down from Bellingham, and stopped in at that place and there he was. . . . Q. Isn't it a fact you only bought a cup of coffee? A. I think I bought a cup of coffee and a cold beef sandwich; his wife makes very good ones. Q. I understood you to say you had never been there before? A. I never had. Q. Well, did you stop there because she made very good sandwiches? A. Why, Your Honor, I stopped there and bought this cup of coffee and a sandwich, and I just said it was very good. Q. What

did you say to him after he served you with this sandwich, as you say he did, and the cup of coffee? A. We started mentioning my work, and I told him I had to work nights after the trial, that I was very busy and that I was working up in Bellingham and going back and forth between Bellingham and Seattle. Q. You told him that? A. Yes, sir, we just talked that way. . . . Q. Well, sir, let me ask you this question: Did you tell him you were very nervous and very much concerned about the outcome of the case? A. I don't remember. Q. You don't remember it? A. No. Q. Would you say you did not? A. I said I didn't remember; I can't tell you one way or the other,—maybe I did and maybe I didn't. . . . Q. Did you try to find out from him what the views of the jury were at that time,—the trial was not yet over was it? A. No, the trial was not yet over. . . . This man told me, he said, 'We had better not discuss this case at all.' . . . well, no, first I want to say that naturally a word was said about the trial,—you couldn't help it,—and he said, 'We had better not discuss it,' and I said 'No, we had not better either,' and then we talked about one thing and another. . . . Q. Why do you suppose he told you 'We had better not talk about the case,' when you didn't suggest to him— . . . Well, before he said that, had you said something to him about wanting to know what the attitude of the jury was, whether it was favorable to you or against you? A. I may have said that I was concerned about the case, and he may have said, 'Well, we'd better not discuss it,' and I said 'No, we'd better not,' and then we talked about other things. . . . Q. After you had your cup of coffee and your sandwich did you go outdoors and come back again? A. I imagine I got in my car and went home. I don't remember coming back. Q. You don't remember going out at all?—Let me ask you this then: After he refused to talk with you about the case, didn't you say to him, 'I've got lots of money out in the car, I had better go out and get it,' and you went out in the car and you came back with a billfold with money in it, and you came in stuffing it in your pocket? A. Yes,

sir, I remember that; it was full of checks that I had picked up for the company up in Bellingham. Q. Yes. Then you told him you had a lot of money in the car, and then after you came back you attempted again to find out from him what the attitude of the jury was, how it stood? A. Absolutely not. . . . Q. You wanted him to know you had a lot of money out in the car, I take it? A. I thought I had forgotten to lock the car and with all this money there, and I was concerned about it. Wouldn't you be? . . . Q. In the course of the conversation did you tell him about the plaintiffs, what you knew about them, and try to influence them against the plaintiffs, and tell about how much trouble you had had with them? A. Absolutely not."

Mr. A. P. Allbright, a member of the jury who sat at the first trial, was then called to the stand by counsel for respondents. He testified that, in the course of the trial, the appellant Friese attempted to discuss the case with him in his restaurant.

"Q. Will you please tell the jury what he said to you when he came in to your place of business? A. Well, he ordered coffee, and we both greeted one another, I having recognized him from the court here, naturally, and he mentioned that of course we're not supposed to speak about the case. . . . And I said, 'No,' and he said, 'But I was just wondering,' he says, 'I'm nervous naturally,' he says, 'and I am just wondering if you knew about how the jurors would go in the case.' . . . Well, I said, 'Naturally the jurors are not supposed to express an opinion until the case is completed, and I wouldn't know how the rest of them felt on it; and if I knew I wouldn't tell you anyway because we aren't supposed to speak of the case at all.' Q. You say he had coffee alone, or did he have something else? A. No, he just had coffee. . . . Q. Then what occurred? Did he stay there a little while? A. Well, he was there for a while, and then he excused himself; he mentioned that he had his purse or folder out in the car with quite a little money in it, and went out after it, and brought it back in.

Q. Did he have it in his hand when he came in? A. Well, he had it, he was adjusting it in his pocket as he came in. . . . Q. Did he discuss the plaintiffs with you? Did he mention them, Mr. and Mrs. Burgin? A. His remark was that he and the company had had trouble with them constantly,—a lot of trouble with them on this case. Q. About how long a time was he there altogether? A. Oh, a half to three-quarters of an hour, I would say."

In *State v. Constantine,* 48 Wash. 218, 93 Pac. 317, it is said:

"It is a rule of evidence, as old as the law itself, applicable alike to both civil and criminal causes, that a party's fraud in the preparation or presentation of his case, such as the suppression or attempt to suppress evidence by the bribery of witnesses or the spoilation of documents, can be shown against him as a circumstance tending to prove that his cause lacks honesty and truth. [Citing cases.]"

The above rule was quoted with approval in *Wood v. Miller,* 147 Wash. 251, 265 Pac. 727.

In *McHugh v. McHugh,* 186 Pa. St. 197, 40 Atl. 410, 65 Am. St. 849, 41 L. R. A. 805, the court says:

"The spoliation of papers and the destruction or withholding of evidence which a party ought to produce gives rise to a presumption unfavorable to him, as his conduct may properly be attributed to his supposed knowledge that the truth would operate against him. This principle has been applied in a great variety of cases, and it is now so well established that it is unnecessary to do more than state it. . . .

"A like presumption arises where in connection with the trial testimony has been fabricated or witnesses suborned or a jury corruptly influenced, or where an attempt has been made to do any of these things."

It was held in *Beck v. Hood,* 185 Pa. St. 32, 39 Atl. 842, that this rule of evidence applies where the improper conduct occurred during the progress of a pre-

vious trial of the same cause. In that case, the trial court had excluded testimony tending to prove that, at the previous trial, the plaintiff attempted to talk to a juror in regard to the probability of the verdict to be rendered, and attempted to demonstrate to the juror a physical fact at issue in the cause. Holding that the proffered testimony was admissible, the supreme court of Pennsylvania said:

"The offer was to show that the witness, who was also the party, had on a former trial of this case sought to reach the jury that had been sworn for its trial by ex parte statements and by other methods equally reprehensible, which were intended to affect their verdict."

The court limited the force of the testimony by instructing the jury that the single fact that the appellant Friese had had the conversation testified to with intent to influence the juror's decision at the first trial, if they believed he did have such intent, was not of itself any legal reason nor sufficient ground for them to find a verdict against the appellants, if their judgment and conscience as jurors led them to conclude otherwise, in the light of all the evidence adduced at the second trial. They were also instructed that in no case should the testimony in reference to the asserted conversation be allowed any force or effect as bearing upon the liability of the other appellant, Universal Credit Company, in the absence of evidence, and there was none, that appellant Friese was acting, at the time of the conversation, in behalf of the credit company and within the scope of his authority as an agent of that company. The court did not err in admitting the challenged testimony.

The appellants next complain of the court's failure to give their requested instruction No. 8, to the effect that "one has possession of personal property when it

is under his dominion or control"; in other words, that the court failed to define the word "possession."

To the ordinary juror, the word "possession" would be easier of understanding than the word "dominion," even when coupled with the word "control." This assignment is without merit.

■ The appellants finally complain of the court's failure to require a reduction of the jury's verdict or, in the alternative, to grant a new trial.

It would serve no useful purpose to extend an opinion already too long by a detailed discussion of the medical testimony. It is sufficient to say that the doctors who testified were not agreed as to the nature of the disease affecting respondent's neck. His own doctor testified that, when he first treated him in the early part of March, 1937, he diagnosed the case as multiple myeloma, which, the doctor explained, is a disease that produces tumors in the bones. The respondent, at the time, complained of much pain, dizzy spells, loss of strength, and inability to work. He was wearing a brace on his neck. After treatment, he improved so much that he could do without the brace, became stronger, and was able to go back to work. After the accident of August 4th, he became progressively worse. The doctor testified that myelomas are conditions that often reoccur unless great care be taken to prevent trauma or injury. He examined the respondent August 5th and found that he complained of pain on moving his neck. He had to resume the use of a brace. In the doctor's opinion, his condition had become "radio resistant"; and this condition was not going to improve, and it could result in respondent's death in from three to five years.

Other doctors testified that the respondent's condition was due to hypertrophic arthritis. The extent to which his condition was brought about or aggravated

by the incidents of August 4th was a question of fact to be determined by the jury on the evidence.

Appellants concede the rule to be that, where a verdict is challenged as excessive, the court's only inquiry is whether it was the result of passion or prejudice. *Sherrill v. Olympic Ice Cream Co.*, 135 Wash. 99, 237 Pac. 14; *Pryor v. Safeway Stores, Inc.*, 196 Wash. 382, 83 P. (2d) 241, 85 P. (2d) 1045.

While the verdict seems large, there is no evidence in the record warranting a conclusion that it was induced by passion or prejudice. It may be remarked that the jury's award in the first trial was considerably larger than the present verdict. In passing upon the motion for a new trial, the lower court said:

"Two juries have allowed the plaintiff husband a recovery. And I do not think there is any reason for me to say that this record has in it that measure of error that justifies the grant of any new trial . . ."

If the trial court, which observed the demeanor of the jurors, could not say that the verdict was influenced by passion or prejudice, with much less reason can we say so from an inspection of the printed record.

The judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.