750

STONE MACHINERY COMPANY, *Appellant,* v. FRANK
KESSLER, *Respondent.*

*S. Dean Arnold* and *Minnick, Hahner & Hubbard,* for appellant.

*E. J. Stanfill,* for respondent.

EVANS, C. J.—Plaintiff Stone Machinery brought this action in Asotin County to repossess a D-9 Caterpillar Tractor which plaintiff had sold to defendant Frank Kessler under conditional sales contract. Service of process was not made on the defendant but plaintiff located the tractor in Oregon and repossessed it. The defendant then filed an answer and cross-complaint in the Asotin County replevin action, alleging that the plaintiff wrongfully and maliciously repossessed the tractor, and sought compensatory and punitive

damages under Oregon law. Trial was to the court without a jury and the court awarded defendant compensatory damages in the sum of $18,586.20, and punitive damages in the sum of $12,000 on defendant's cross-complaint.

The operative facts are not in serious dispute. Defendant Kessler purchased, by conditional sales contract, a used D-9 Caterpillar Tractor from the plaintiff Stone Machinery, for the sum of $23,500. The unpaid balance of $17,500 was to be paid in monthly installments, with skip payments. The defendant's payment record was erratic and several payments were made late. However, payments of $3,600 on March 29, 1966, and $1,800 on July 18, 1966, put the contract payments on a current basis. The payment due on August 10, 1966 was not made and, on September 7, 1966, plaintiff's credit manager, Richard Kazanis, went to the defendant's ranch in Garfield, Washington, and demanded payment of the balance due on the contract or immediate possession of the tractor. At this time defendant had made payments on the purchase price totaling $17,200, including the trade-in. The defendant was unable to make full payment, or any payment at that time, and informed Mr. Kazanis that he would not relinquish possession of the tractor to him at that time, or at any time in the future, in the absence of proper judicial proceedings showing his right to repossess, and that "someone would get hurt" if an attempt was made to repossess without "proper papers." At that time the defendant informed Mr. Kazanis that he, the defendant, expected to be awarded a contract by the United States Bureau of Fisheries to do some work with the D-9 at their installation on the Grande Ronde River near Troy, Oregon, and that he would then be able to pay on the tractor.

On September 13, 1966, the plaintiff instituted this action in Asotin County, Washington, but the sheriff was unable to locate the tractor in that county. Thereafter, the plaintiff instituted another action in Garfield County, but the sheriff was unable to locate the tractor in that county. The evidence indicates that on September 24 Kessler took the tractor to Oregon to work the bureau of fisheries job.

On September 27, 1966, Mr. Kazanis, by use of an airplane, located the tractor on the Grande Ronde River, west of Troy, Wallowa County, Oregon. He then contacted the sheriff of Wallowa County and requested him to accompany them in the repossession of the tractor to prevent any violence by the defendant. The sheriff agreed to meet with Mr. Kazanis at Troy, Oregon, and on September 27, 1966, Mr. Kazanis in his private car, plaintiff's mechanic in a company pickup, and the plaintiff's truck driver in the company lo-boy truck, left Walla Walla, and the following morning met the Wallowa County Sheriff at Troy, where the sheriff was shown a copy of the conditional sales contract. The sheriff confirmed previous legal advice plaintiff had received that the plaintiff had the right to repossess the tractor (although not by the use of force) and thereupon the sheriff, in his official sheriff's car, followed by Mr. Kazanis in his private car, the mechanic in the pickup, and the truck driver in the lo-boy, proceeded to the scene where the defendant was operating the D-9 tractor in the Grande Ronde River approximately 7 miles west of Troy, pursuant to contract with the United States Bureau of Fisheries.

Upon arriving at the scene the sheriff, accompanied by Mr. Kazanis, walked to the edge of the river and motioned the defendant, who was working with the tractor in the river, to bring the tractor to shore. The sheriff was in uniform and wearing his badge and sidearms. The sheriff informed the defendant that the plaintiff Stone Machinery had a right to repossess the tractor, and stated, "We come to pick up the tractor." The defendant asked the sheriff if he had proper papers to take the tractor and the sheriff replied, "No." The defendant Kessler protested and objected to the taking of the tractor but offered no physical resistance because, as he testified, "he didn't think he had to disregard an order of the sheriff." The plaintiff's employee then loaded the tractor on the lo-boy and left for Walla Walla, Washington.

Within a few days the tractor was sold to a road contrac-

tor at Milton-Freewater, Oregon, for the sum of $7,447.80 cash, on an "as is" basis. The sale price represented the balance due on the contract, plus the plaintiff's charges for repossession.

Plaintiff's first assignments of error are directed to the following findings of the trial court:

### XII

That the plaintiffs actions in repossessing the defendent's tractor on September 28, 1966, and the actions of the Wallowa County Sheriff, in aid of the plaintiffs, amounted to constructive force, intimidation and oppression, constituting a breach of the peace and conversion of defendent's tractor.

### XIV

That the plaintiffs failed to show just cause or excuse for the wrongful act of repossession of the defendent's tractor on September 28, 1966.

### XV

That the wrongful act of repossession, done intentionally on September 28, 1966, was malicious and was so wanton and reckless as to show disregard for the rights of the defendent, Frank Kessler.

■ Defendant Kessler's cross-claim is predicated on the theory that Stone Machinery Company committed a tort in Oregon. To resolve this question we must look to Oregon law. As stated in *Maag v. Voykovich*, 46 Wn.2d 302, 303, 280 P.2d 680 (1955):

> The law of the place where a tort is committed controls the questions in connection with the act, the responsibility therefor, and the nature of a cause of action based thereon. *Richardson v. Pacific Power & Light Co.* (1941), 11 Wn. (2d) 288, 118 P. (2d) 985; *Mountain v. Price* (1944), 20 Wn. (2d) 129, 146 P. (2d) 327.

Where a servant acts in one state under direction of a master in another, the law of the state where the servant acts governs. Restatement, Conflict of Laws, §§ 67, 387 (1934).

Retaking possession of a chattel by a conditional seller, upon the default of the buyer, is governed by O.R.S. 79.5030:

Secured party's right to take possession after default. Unless otherwise agreed a secured party h'as on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process *if this can be done without breach of the peace* or may proceed by action.

(Italics ours.)

Defendant Kessler was admittedly in default for nonpayment of the August and September contract installments. By the terms of the above statute Stone Machinery had the right to take possession of the tractor without judicial process, but only if this could be done without a breach of the peace. The question is whether the method by which they proceeded constituted a breach of the peace.

■ No Oregon cases have been cited which define the term "breach of peace" so we must look to other authority. In Restatement of Torts 2d, § 116 (1965), the term is defined as follows:

A breach of the peace is a public offense done by violence, or one causing or likely to cause an immediate disturbance of public order.

In the case of *McKee v. State,* 75 Okla. Crim. 390, 132 P.2d 173 (1942) breach of peace is defined, (headnote 9, 132 P.2d 173) as follows:

To constitute a "breach of the peace" it is not necessary that the peace be actually broken, and if what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required, nor is actual personal violence an essential element of the offense.

In the instant case it was the sheriff who said that he had no legal papers but that "we come over to pick up this tractor." Whereupon, the defendant Kessler stated, "I told him I was resisting this; there was an action started and I wanted to have a few days to get money together to pay them off." At this point defendant Kessler had a right to obstruct, by all lawful and reasonable means, any attempt by plaintiff to forcibly repossess the tractor. *Burgin v. Universal Credit Co.,* 2 Wn.2d 364, 98 P.2d 291 (1940). Had

the defendant offered any physical resistance, there existed upon both the sheriff and plaintiff's agents a duty to retreat. See *Westerman v. Oregon Auto. Credit Corp.,* 168 Ore. 216, 122 P.2d 435 (1942). However, confronted by the sheriff, who announced his intention to participate in the repossession, it was not necessary for Kessler to either threaten violence or offer physical resistance. As stated by the court in *Roberts v. Speck,* 169 Wash. 613, 616, 14 P.2d 33 (1932), citing from Jones on Chattel Mortgages § 705 (4th ed.):

> "The mortgagee becomes a trespasser by going upon the premises of the mortgagor, accompanied by a deputy sheriff who has no legal process, but claims to act *colore officii,* and taking possession without the active resistance of the mortgagor. To obtain possession under such a show and pretence of authority is to trifle with the obedience of citizens to the law and its officers."

Acts done by an officer which are of such a nature that the office gives him no authority to do them are *"colore officii."* See 7A Words & Phrases at 296 (Perm. ed.).

In *Burgin v. Universal Credit Co., supra,* the conditional seller retook possession from the buyer, after default in payments, and in order to do so secured the presence of a police officer, without legal papers. The only act of the officer was to order the buyer to release the brakes and drive the car to the curb. The court said:

> "Because a party to a contract violates his contract and refuses to do what he agreed to do, is no reason why the other party to the contract should compel the performance of the contract by force. The adoption of such a rule would lead to a breach of the peace, and it is never the policy of the law to encourage a breach of the peace. The right to an enforcement of this part of the contract must, in the absence of a consent on the part of the mortgagor, be enforced by due process of law the same as any other contract."

As stated in *Roberts v. Speck, supra,* and quoted with approval in *Burgin v. Universal Credit Co., supra,*

> The reason for the rule requiring a person to resort to process of law in undertaking to acquire possession of

property to which he is entitled by virtue of a contract with the person in possession, when such party refuses to peaceably surrender it, is the same whether the possession be acquired by virtue of the terms of a chattel mortgage or a conditional bill of sale. The law does not encourage people to resort to a breach of the peace, . . .

In the case of *Firebaugh v. Gunther,* 106 Okla. 131, 233 P. 460 (1925), the defendant secured the services of a deputy sheriff to take possession of the property. The deputy sheriff, not having legal papers, stated "he was going to take the property and did not want to make any trouble." It was held that his conduct constituted intimidation amounting to force.

In the case of *Beneficial Fin. Co. v. Wiener,* 405 P.2d 691 (Okla. 1965), the mortgagee sought to repossess furniture from the mortgagor after default in payment. The mortgagee accompanied a constable who had legal papers issued by the wrong court. The court said:

[A] mortgagee cannot resort to force, threats or intimidation to secure possession of mortgaged property, even though the terms of the contract entitle him to possession after default. [p. 694]

"A mere illegal taking or wrongful assuming of right to personal property constitutes 'conversion' and no further step is necessary to perfect right of action therefor." [p. 697]

"The only restrictions upon the mode by which the mortgagee secures possession of the mortgaged property, after breach of condition, are that he must act in an orderly manner and without creating a breach of the peace, and must not intimidate by securing the aid of an officer, who pretends to act colore officii." [p. 696]

In the instant case, when the sheriff of Wallowa County, having no authority to do so, told the defendant Kessler, "We come over to pick up this tractor", he was acting colore officii and became a participant in the repossession, regardless of the fact that he did not physically take part in the retaking. Plaintiff contends that its sole purpose in having the sheriff present was to prevent anticipated vio-

lence. The effect, however, was to prevent the defendant Kessler from exercising his right to resist by all lawful and reasonable means a nonjudicial take-over. To put the stamp of approval upon this method of repossession would be to completely circumvent the purpose and intent of the statute.

We hold there is substantial evidence to support the trial court's finding that the unauthorized actions of the sheriff in aid of the plaintiff amounted to constructive force, intimidation and oppression constituting a breach of the peace and conversion of the defendant's tractor.

Appellant Stone Machinery next assigns as error the finding by the trial court that the tractor had a fair market value of $24,900 when repossessed.

The testimony as to fair market value from witnesses permitted to testify as experts took a wide range. One reason for this variance was due to the difference of opinion among the witnesses as to the condition of the tractor at the time of repossession. However, one witness, Thurston Storey, who had been an earth-moving contractor for 21 years, during which time he had purchased a total of 12 Caterpillar Tractors, and who owned four Caterpillar Tractors of an earlier model at the time of testifying, and who was a mechanic who did his own repair work, testified that the D-9 tractor in question was in excellent condition, and placed its fair market value at $25,000, less $100 for the repair of one piston.

This estimate of value was to some extent supported by exhibit 5, which is Stone Machinery's 1967 spring catalog, advertising the sale of used tractors. The catalog contains pictures of tractors, together with their selling price. A tractor testified to as being similar to the D-9 tractor in question, but of a year-later model, is listed in the catalog with a selling price of $25,500. This same tractor was examined by Mr. Storey, who found its condition to be "good" but not as good as the Kessler tractor.

Appellant Stone Machinery attacks the competency of Mr. Storey to testify as an expert on value. A review of

the testimony relating to value leads this court to the conclusion that appellant's objection goes more to the weight of the testimony of Mr. Storey rather than to the admissibility of his testimony. The weight to be given to the testimony of a witness is peculiarly within the province of the trial court. There is substantial evidence to support the trial court's finding that the fair market value of the tractor in question was $24,900 at the time of repossession, and this court is not authorized to substitute its findings for that of the trial court. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

Plaintiff's final assignment of error relates to the trial court's award of punitive damages. The Oregon law regarding punitive damages has recently been set forth in the case of *Douglas v. Humble Oil & Refining Co.,* . . . . Ore. . . . . 445 P.2d 590 (1968):

> As a general rule, punitive damages will be allowed only when the proof supports a finding that the defendant acted with improper motives or with willful, wanton, or reckless disregard for the rights of others. . . .
>
> We held recently that it is only in those instances where the violation of societal interests is sufficiently great and of a kind that sanctions would tend to prevent that the use of punitive damages is proper. "Regardless of the nomenclature by which a violation of these obligations is described (grossly negligent, willful, wanton, malicious, etc.), it is apparent that this court has decided that it is proper to use the sanction of punitive damages where there has been a particularly aggravated disregard . . ." of the rights of the victim. *Noe v. Kaiser Foundation Hospitals,* Or., 435 P.2d 306 (1967).

See also *McElwain v. Georgia-Pac. Co.,* 245 Ore. 247, 421 P.2d 957 (1966); *Becker v. Pearson,* 241 Ore. 215, 405 P.2d 534 (1965); *Hall v. Work,* 223 Ore. 347, 354 P.2d 837, 366 P.2d 533 (1960).

Defendant Kessler was in default of his contract and had announced his intention to resist any attempted nonjudicial repossession. The words used in announcing his intention, namely, "someone would get hurt", were of such a nature as to justify the presence of a sheriff during any attempt at

peaceable repossession although, as we have already held, this did not justify participation by the sheriff in the process of repossession. However, the fact that the sheriff did undertake to act *colore officii* in the repossession was not, under the circumstances, sufficient to support a finding that the plaintiff thereby displayed a particularly aggravated disregard for the rights of Kessler, within the meaning of *Douglas v. Humble Oil & Refining Co., supra.*

Judgment for compensatory damages is affirmed. Judgment for punitive damages is reversed.

GREEN and MUNSON, JJ., concur.

Petitions for rehearing denied January 21, and February 16, 1970.