397 So.2d 1020 (1981)
Katherine L. QUEST and Sea-Sky Travel Agency, Inc., Appellants,
v.
BARNETT BANK OF PENSACOLA, Appellee.
No. SS-487.
District Court of Appeal of Florida, First District.
May 11, 1981.
*1021 Charles L. Cetti of Cetti & McGraw, Pensacola, for appellants.
John F. Windham of Beggs & Lane, Pensacola, for appellee.
ERVIN, Judge.
Quest and Sea-Sky Travel Agency, Inc., appeal an order granting a directed verdict at the close of their case-in-chief in an action which had sought damages against the bank based upon alternative theories of trespass, conversion, negligence, and a count filed pursuant to Section 679.507, Florida Statutes (1975), authorizing a statutory right of action against a secured party who does not proceed against a debtor in accordance with the procedure required by Part V of Chapter 679. Appellants contend that the court erred in directing a verdict because (1) the bank had no authority to declare appellants in default of their obligations and to accelerate two promissory notes, one a demand and the other an installment note,[1] and (2) the bank's self-help measures constituted a breach of the peace and were therefore unlawful. We affirm the trial court's finding on the first point, but reverse as to the second point and remand for further proceedings consistent with this opinion.
As to the bank's right to accelerate, it is obvious that the bank could require immediate payment of the demand note, since by its terms it could be called at any time with or without reason. See comment to U.C.C. § 1-208. The only substantial issue before us is whether the bank had the right to accelerate the installment note, which contained the standard provision that the note could be accelerated "if the bank at any time feels insecure for any reason." Section 671.208, Florida Statutes (1975), explains that the word "insecure" means that the creditor "shall have power to [accelerate] only if he in good faith believes that the prospect of payment or performance is impaired." The burden of establishing the creditor's lack of good faith is placed by the statute upon the debtor.
We conclude from the evidence that Mrs. Quest did not meet her burden since she did not present evidence from which a jury could infer that the bank did not act in good faith in accelerating the two notes. In January, 1977, at the time the decision was made to accelerate payment of the remaining balance on the two notes of $41,600, the bank was confronted with the following circumstances: A draft in the amount of $10,000 had been accepted for payment, thereby creating a $6,500 overdraft; an additional draft for $6,000 had just been presented, although not accepted, and the bank had been informed that yet another draft in the amount of $14,000 would soon be presented.
The facts in the present case closely parallel those in Farmers Co-Op El., Inc., Duncombe v. State Bank, 236 N.W.2d 674 (Iowa 1975), in which a grain elevator brought an action against a bank for the latter's wrongful dishonor of checks and tortious interference with its prospective business advantage. Following the jury's verdict in favor of the elevator, the trial court entered judgment for the bank, notwithstanding *1022 the verdict, and the elevator appealed. After reviewing evidence showing that the elevator owed the bank $272,000 on six notes, and that it needed $50,000 within the next two weeks, and showing also that the bank was aware that the elevator had sustained a loss of $22,000 in the fiscal year just completed, the Iowa Supreme Court held that the bank's concern about the security of its loan was in good faith and that its acceleration of the notes was not, under the circumstances, improper. In construing U.C.C. § 1-208, the court stated that the burden imposed upon the debtor was "to introduce substantial evidence of lack of good faith; a mere scintilla would not suffice." 236 N.W.2d at 677. It rejected the debtor's argument that the good faith requirement of the statute requires not only honesty in fact, but also a reasonable belief by the creditor that the debtor's prospects of payment would be impaired, observing that "decisions construing [the statute] overwhelmingly agree that the test of good faith under that section is a wholly subjective one of honesty." Id. at 678.
We adopt the reasoning of the Iowa Supreme Court, and conclude that the debtor here has not presented substantial proof that the bank's concern about the security of its notes, whether or not reasonable, was not genuine, or that the bank had an ulterior motive. There was consequently no fact issue to be determined by a jury that the bank accelerated without good faith.
Mrs. Quest also argues that the bank was not legally authorized to declare the notes in default because she had relied upon a course of past dealings and prior agreements which had existed between the parties permitting the account to be overdrawn until the indebtedness was extinguished by the collection of receivables. She cites Ford Motor Credit Company v. Waters, 273 So.2d 96 (Fla.3d DCA 1973), as authority for her position, which held that because the buyer's pattern of payments was irregular and deviated substantially from the terms of the contract, the seller could not retake the goods without notice and without demand for the outstanding balance. The facts in the instant case are, however, clearly distinguishable from those in Waters. Although the evidence here reveals that there had existed a similar pattern of conduct, it also reveals that in October of 1976, following the acceptance of an overdraft, a loan agreement was executed by the parties providing that the travel agency would maintain net working capital, meaning the excess of current assets over current liabilities, in an amount no less than $10,000. Under the circumstances, Mrs. Quest cannot be said to have reasonably relied on the bank's prior practices, and must be considered to have been placed on notice by the terms of the loan agreement of the bank's change in policy.
The second issue, concerning whether the bank's self-help measures were lawful, is a far more difficult one to determine. On January 27, 1977, the bank seized possession of appellants' assets without judicial process. On that date, a bank agent phoned Mrs. Quest, who was at home ill, and requested her to come immediately to her place of business, because he intended to close it down. Mrs. Quest informed the agent that she could solve the cash flow problem in 48 hours, but he declined any further extensions. During a later telephone conversation, she advised the agent that there were very important papers in her office and that she needed more time to place her business affairs in order. He responded that she could come to the office and that the bank would not do anything until then. When she arrived at the scene, the bank's agents had already taken action; many of the business's contents had been removed, and the records were scattered on the floor. An employee of Sea-Sky testified that when one of the agents first arrived at the premises, she told him that she was not authorized to take any action, and that he would have to talk first with Mrs. Quest. The bank's agent testified as an adverse witness, and did not refute the essence of Mrs. Quest's or the employee's testimony.
The bank defends its self-help remedy by asserting that its actions were sanctioned *1023 by its security agreement giving it "immediately and without demand any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code." More specifically, the bank contends that its actions were authorized by Section 679.503, permitting a secured creditor to take possession of collateral "if this can be done without breach of the peace... ."
This statute has been construed as providing a creditor a very limited right of possession. A two-pronged test has been established to determine whether a "`breach of the peace has occurred'" within the meaning of the statute: "`(1) whether there was entry by the creditor upon the debtor's premises, and (2) whether the debtor or one acting in his behalf consented to the entry and repossession.'" Marine Midland Bank-Central v. Cote, 351 So.2d 750, 752 (Fla.1st DCA 1977) (quoting from White and Summers, Uniform Commercial Code, 966 (1962)). There is no dispute in the record that there was entry by the bank upon Mrs. Quest's business premises.
The second part of the test requires more analysis. White and Summers, in their Handbook of the Law Under the Uniform Commercial Code. (West 1972), at pages 966-969, discuss considerations which courts have grappled with in determining whether a debtor may be said to have lawfully consented to the entry:
In general, the creditor may not enter the debtor's home or garage without permission, but he can probably take a car from the debtor's driveway without incurring liability. The debtor's consent, freely given, legitimates any entry; conversely, the debtor's physical objection bars repossession even from a public street. This crude two-factor formula of creditor entry and debtor response, must, of course, be refined by at least a consideration of the third party response, the type of premises entered, and possible creditor deceit in procuring consent.

Perhaps the most articulate and forceful statement of the general rule that entry into the debtor's residence in his absence is a breach of the peace is found in Girard v. Anderson, 219 Iowa 142, 257 N.W. 400 (1934). There the creditor repossessed a piano from the debtor's home in the latter's absence. The debtor maintained that the house had been locked; the creditor testified that his agents entered through an unlocked door. Despite the presence of a clause in the sales contract purporting to authorize forcible entries, the court found that the entry, even according to the creditor's testimony, was a breach of the peace.
* * * * * *
Thus, the great majority of courts find unauthorized entries into the debtor's residence to be breaches of the peace, and many find entry into his place of business or garage to be such a breach. As one moves away from the residential threshold to the yard, the driveway, and finally the public street, however, the debtor's argument becomes progressively more tenuous... . (e.s.) (footnotes omitted) (quoted with approval in Northside Motors of Florida, Inc. v. Brinkley, 282 So.2d 617 (Fla. 1973) at 624).
A thorough analysis of the question whether consent was given the creditor to enter the debtor's premises requires consideration of the following factors. First, a debtor's consent to a creditor to enter into an enclosed area, even if expressed, must be freely and voluntarily given. Cf. Marine Midland Bank-Central, supra; Northside Motors, supra. There are ample facts in the record from which the jury could have inferred that Mrs. Quest's consent was not voluntarily given. Although it is true that Mrs. Quest never ejected the bank's agents from the premises, she did request that they delay their action. Compare Benschoter v. First National Bank, 218 Kan. 144, 542 P.2d 1042 (1975), in which it was held that a son's request for the creditor to wait until the father returned was a sufficient protest to invalidate the creditor's self-help action. It could also be inferred from the record that resistance to the bank's actions would have been fruitless, since at the time Mrs. Quest first arrived at the business after being *1024 notified by the bank's agent, the process of closing the business down had already begun.
Second, permission to come upon one's premises may be implied from custom, usage, or conduct; but such implied consent is limited to those acts that are within a fair and reasonable interpretation of the terms of the grant. Sacco v. Eagle Finance Corp. of North Miami Beach, 234 So.2d 406 (Fla.3d DCA 1970); Boston Manufacturer's Mutual Insurance Co. v. Fornalski, 234 So.2d 386 (Fla.4th DCA 1970). Cf. Florida Publishing Co. v. Fletcher, 340 So.2d 914 (Fla. 1976). In Sacco, it was held that a directed verdict against the plaintiff on a count of trespass was improperly granted in that the jury should have been allowed to resolve the question as to whether the facts adduced at trial showed that the boundaries of consent were overreached by purported unreasonable conduct of the creditor's agent.
In the instant case, it is arguable whether the facts reveal that implied consent was given the bank, either by appellants' custom or conduct, to enter and repossess. Yet, even if that issue were conclusively established against appellants by the facts, it would be a jury question whether the bank overreached the consent given. There was evidence that Mrs. Quest's acquiescence was obtained by promises from the bank's agents which were not kept. She was told over the phone by the bank's agent to come down to the business premises because it was his intention to close the business. Yet, this action had already been taken before she arrived. The evidence is even stronger that the bank's agent also violated his promise to Mrs. Quest that the bank would give her until the following morning to put her business papers in order.
A creditor has been held liable for trespass when the self-help remedy has been accomplished through the use of fraud and deceit. See, e.g., Barham v. Standridge, 201 Ark. 1143, 148 S.W.2d 648 (1941) (creditor secured possession by promising to repair the car); Rhodes-Carroll Furniture Co. v. Webb, 230 Ala. 251, 160 So. 247 (1935) (creditor posed as policeman); Stone Mach. Co. v. Kessler, 1 Wash. App. 750, 463 P.2d 651 (1970) (creditor repossessed tractor with unauthorized aid of a uniformed sheriff's deputy); Skeels v. Universal C.I.T. Credit Corp., 335 F.2d 846 (3d Cir.1964) (creditor entrapped debtor by assuring him that future credit would be extended). The evidence in this case is such that a jury could infer that the bank willfully misinformed its debtor as to the time its self-help remedy would be exercised.
Moreover, even if the bank's entry of the premises could be said to have been accomplished without a breach of the peace, there is evidence in the record that the manner in which it carried out its self-help remedy was improper. A breach of peace can occur if the secured party damages property of the debtor while affecting repossession. See, Whisenhunt v. Allen Parker Co., 119 Ga. App. 813, 168 S.E.2d 827 (1969). Also, a creditor is liable for any negligence resulting in damage to the debtor's collateral. Southern Industrial Savings Bank v. Greene, 224 So.2d 416 (Fla.3d DCA 1969). Section 679.504 recognizes this standard by providing that the method of disposal of assets pursuant to the self-help remedy shall be carried out in a "commercially reasonable" manner. One of the general provisions of the Uniform Commercial Code is that "[e]very contract within this act imposes an obligation of good faith in its performance or enforcement." See Section 671.203. Additionally, Section 671.103 provides that principles of equity shall supplement the code. "These provisions superimpose a general requirement of fundamental integrity in commercial transactions regulated by the code." Skeels v. Universal C.I.T. Credit Corp., supra at page 851.
We conclude that as to the second point raised, the facts taken as a whole establish a prima facie case for a jury's consideration.
Reversed and remanded for further proceedings consistent with this opinion.
SMITH and SHIVERS, JJ., concur.
NOTES
[1] These notes were originally taken out of February, 1976, in the total amount of $44,000, for the purpose of alleviating a cash flow problem which had plagued the agency for nearly two years. Under the unique circumstances peculiar to travel agencies, the agency is required to pay the Air Traffic Conference (ATC) the cost of airline tickets purchased by its customers within 10 days following a given time period. There is ordinarily a delay of 14-45 days before the agency receives reimbursement from its customers for these costs. Hence the necessity in the instant case for the two loans, which were secured by accounts receivable and by furniture and fixtures for a total value of $43,990.