RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0319p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SHEILA HENSLEY and MCCLELLAN HENSLEY,
SR.,

     *Plaintiffs-Appellants/Cross-Appellees*
          (11-1071 & 11-1129),

MCCLELLAN HENSLEY , JR.,
        *Plaintiff-Appellee* (11-1129),


     *v.*


RONALD GASSMAN, d/b/a REPORON,
        *Defendant-Appellee* (11-1071),


KEVIN SCOTT  and BRIAN GILBERT, JR.,
    *Defendants-Appellees/Cross-Appellants*
          (11-1071 & 11-1129),


HOWIE S. HANFT, BURNS LIQUIDATING, LLC
f/k/a Burns Recovery, LLC,
          *Defendants.*

Nos. 11-1071/1129

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:09-cv-12751—Thomas L. Ludington, District Judge.

Argued: April 11, 2012

Decided and Filed:  September 11, 2012

Before:  BATCHELDER, Chief Judge; McKEAGUE, Circuit Judge; and QUIST,
District Judge.[*]

_____

     [*]The Honorable Gordon J. Quist, Senior United States District Judge for the Western District of
Michigan, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** J. Nicholas Bostic, LAW OFFICE, Lansing, Michigan, for Appellants/Cross-Appellees. G. Gus Morris, McGRAW MORRIS P.C., Troy, Michigan, for Appellees/Cross-Appellants. **ON BRIEF:** J. Nicholas Bostic, LAW OFFICE, Lansing, Michigan, for Appellants/Cross-Appellees. G. Gus Morris, McGRAW MORRIS P.C., Troy, Michigan, for Appellees/Cross-Appellants.

---

**OPINION**

---

QUIST, District Judge. This case presents the classic scenario of a repo-man attempting to snatch a creditor's collateral – here a vehicle – under cover of darkness in the middle of the night from a defaulting debtor. Although the repo-man, Ronald Gassman, attained his objective, things did not go quite as smoothly as he had hoped: the possessor of the vehicle verbally and physically opposed the repossession; Gassman had to pull the vehicle with the possessor inside from the driveway into the road; and Deputies Brian Gilbert and Kevin Scott, whom Gassman enlisted to stand by in case of trouble, eventually broke the vehicle's window and physically extracted the possessor so that Gassman could tow the vehicle away. To top it off, Gassman later confirmed what the possessor had told him and the police officers, that is; Gassman had no valid basis to repossess the vehicle in the first place because the creditor had rescinded its repossession order.

The possessors/debtors, McClellan Hensley, Sr., and Sheila Hensley, sued Gassman and Deputies Scott and Gilbert, alleging, among other things, that Deputies Scott and Gilbert violated their Fourth and Fourteenth Amendment rights and that Deputies Scott and Gilbert conspired with Gassman to violate the Hensleys' constitutional rights. The district court granted summary judgment to Deputies Scott and Gilbert on the Fourth Amendment claim on the basis of qualified immunity and granted summary judgment to all Defendants on the conspiracy claim. The Hensleys appeal the district court's grant of summary judgment on both claims. In turn, Deputies Gilbert and Scott cross-appeal the district court's ruling that their conduct violated the Fourth

Amendment. For the following reasons, we reverse in part, affirm in part, and dismiss the Deputies' cross-appeal for lack of jurisdiction.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed in the record.

On August 13, 2008, at approximately 3:15 a.m., Gassman, who repossessed collateral for lenders in the Ogemaw County, Michigan area, went to the Hensley residence in Prescott, Michigan, to repossess a four-door Buick. Plaintiff McClellan Hensley, Sr. (Hensley Sr.), owned the Buick, but his wife, Sheila Hensley, drove it. After observing the Buick in the driveway at the Hensley residence, Gassman and his helper, Christian Wottrich, drove down the road and called the sheriff's department to request police presence, also known as a "civil stand-by," during the repossession. Gassman requested police assistance because Hensley Sr.'s conduct during a previous repossession resulted in an assault charge against Hensley Sr., and Gassman was concerned about potential violence.

Deputies Scott and Gilbert were dispatched to assist Gassman. The Deputies met Gassman and followed him to the Hensley residence. When they arrived, the Deputies pulled their patrol car onto the Hensleys' property, and Gassman backed his tow truck into the driveway toward the Buick, which was parked facing the house. At some point, apparently after they arrived, Gassman told the Deputies that he had a repossession order and showed them a file containing some documents. The Deputies did not read the documents.

At the time, Hensley Sr. was away at work, but Sheila and their adult son, McClellan Hensley, Jr. (Hensley Jr.), were at home sleeping. As the Deputies walked toward the Buick, Sheila and Hensley Jr. woke up and went to the door. Sheila and Hensley Jr. stepped outside onto the porch and began telling Gassman and the Deputies that they should not take the Buick. Hensley Jr. stood between the Buick and the tow truck to prevent Gassman from hooking up the Buick. Hensley Jr. shouted at Deputy Gilbert, who was standing nearby, as well as Gassman and Wottrich, telling them that

they could not take the vehicle and had to leave the property. Deputy Gilbert responded that they were not going to leave and that Gassman was taking the Buick. Deputy Scott ordered Hensley Jr. to step out of the way. Hensley Jr. moved to the side of the Buick after Gassman bumped him with the tow truck while backing up to the Buick.

While Hensley Jr. was shouting at Deputy Gilbert, Sheila explained to Deputy Scott that her payments were up to date and the car was not supposed to be repossessed. Deputy Scott responded that he did not care and, if that were the case, she could take her paperwork to Gassman or Burns Recovery (Gassman's client) in the morning to sort things out. In spite of Sheila's protest, Deputy Scott said that Gassman still had to take the Buick. In response, Sheila got into the Buick, started it, and locked the doors. She then lowered her window and shouted for Hensley Jr. to get her cell phone from the house. Hensley Jr. retrieved the phone and handed it to Sheila as she put the window down. By this time, Gassman and Wottrich were out of their truck and lying on the ground attempting to hook chains to the Buick's rear axle. At some point, Deputy Scott went to the Buick's driver-side window and ordered Sheila to exit the vehicle. She did not comply. Deputy Scott continued to shout at Sheila and threatened to break the window because Sheila had put the car in drive and was pulling the tow truck, which by then was chained to the car, toward Gassman and Wottrich as they were on the ground next to the rear wheels of the Buick.[1] When Sheila still refused to get out, Deputy Scott unsuccessfully tried to break the car window with the butt of his handgun.

After Gassman hooked up the Buick and with Sheila still inside, Deputy Scott told Gassman to pull it out of the driveway and into the road. Once the Buick was parked on the road, Deputy Scott ordered Sheila several times to exit the vehicle, but she did not comply.[2] Deputy Scott then used a hammer to break the passenger-side window, reached inside, and unlocked the doors. Deputy Gilbert then opened the driver-side door

---

[1]Sheila and Hensley Jr. both dispute that Sheila put the car in gear and that it moved forward. (Sheila Hensley Dep., R.E. 31-8 at 70-71; Hensley Jr. Dep., R.E. 31-7 at 72.)

[2]At some point, Deputy Scott retrieved a rifle from his patrol car. Hensley Jr. alleges that Deputy Scott momentarily pointed the rifle at him, which is the basis of Hensley Jr.'s separate state-law assault claim that the district court dismissed without prejudice.

and pulled Sheila from the car. Deputy Scott opened the passenger-side car door, began moving items from the back to the front seat of the car, and told Sheila that if she wanted anything from the car, she should "get it out now." After Sheila and Hensley Jr. retrieved Sheila's personal belongings, Gassman re-hooked the Buick and towed it away.

Lo and behold, later that morning Gassman discovered that Sheila was indeed telling the truth about the payment. He had another tow truck driver return the Buick to the Hensleys.

The Deputies did not arrest Sheila that morning, nor, apparently, did they even mention that she had committed a crime. About a week later, however, on August 21, 2008, they submitted a warrant request to the prosecutor seeking felonious assault charges. On August 28, 2008, a judge signed a felony warrant charging Sheila with two counts of assault with a dangerous weapon in violation of M.C.L. § 750.82, based on her pulling the tow truck toward Gassman and Wottrich while they were on the ground. Following a preliminary examination, Sheila was bound over on two counts of felonious assault and a charge of reckless driving. On May 19, 2010, Sheila pled no contest to both counts of felonious assault and to a misdemeanor charge of attempted aggravated assault.

Sheila, Hensley Sr., and Hensley Jr. sued Gassman and Deputies Gilbert and Scott alleging § 1983 and various stat law claims. The Deputies moved for summary judgment on all claims, and Sheila and Hensley Sr. responded with their own summary judgment motion on the § 1983 claims. The district court granted the Deputies' motion on the Fourth Amendment and conspiracy claims and dismissed the state-law claims without prejudice.[3] Regarding the Fourth Amendment claim, the district court found that the Deputies' conduct was more than mere presence at the scene, resulting in a constitutional violation. The district court nonetheless concluded that the Deputies are entitled to qualified immunity.

---

[3]The Hensleys also sued Sheriff Howie Hanft on a failure to train/supervise theory. The district court concluded that the Hensleys failed to present sufficient facts to establish their claim against Sheriff Hanft. The Hensleys do not appeal this ruling.

## II.  STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo. Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009).  A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010). Because the parties have filed cross-motions for summary judgment, we "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

## III.  ANALYSIS

### A.  The Deputies' Cross-Appeal

The Deputies cross-appeal the district court's conclusion that the Deputies' conduct during the repossession constituted state action that resulted in a Fourth Amendment violation.  Because the Deputies obtained all the relief they sought from the district court on the Hensleys' Fourth Amendment claim, we lack jurisdiction to consider the Deputies' appeal.  "There is generally no appellate jurisdiction when the appellant does not seek a change in the relief ordered by the judgment appealed from." *Wheeler v. City of Lansing*, 660 F.3d 931, 939 (6th Cir. 2011).  In *Wheeler*, as in this case, the district court concluded that the defendant violated the plaintiff's Fourth Amendment rights but held that the defendant was entitled to qualified immunity.  The plaintiff appealed the summary judgment order and the defendant cross-appealed the district court's ruling on the constitutional violation. *See id.* at 935-37.  This court held that it lacked jurisdiction to consider the cross-appeal because "'a prevailing party cannot appeal an unfavorable aspect of a decision in its favor.'" *Id.* at 939-40 (quoting *ASARCO, Inc. v. Sec'y of Labor*, 206 F.3d 720, 722 (6th Cir. 2000)).  The court acknowledged *Camreta v. Greene*, — U.S. —, 131 S. Ct. 2020 (2011), in which the Supreme Court held that neither Article III nor prudential concerns bar an immunized official from seeking review of a ruling that his conduct violated the constitution.  The

court concluded, however, for reasons expressed in *Camreta*, that *Camreta* is limited solely to situations in which an immunized defendant seeks Supreme Court review of an appellate court's determination of a constitutional violation. *Id.* at 940. In light of *Wheeler*, we dismiss the Deputies' cross-appeal for lack of jurisdiction.[4]

**B. The Hensleys' Appeal**

**1. Fourth Amendment Claim**

The standards for determining qualified immunity are well-established. Qualified immunity shields individual government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A law enforcement officer is entitled to qualified immunity if "a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information the . . . officer[] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Qualified immunity extends to government officials' objectively reasonable mistakes, "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). This court applies a two-step inquiry to determine qualified immunity, which considers (1) whether the defendant violated a constitutional right; and (2) whether that right was clearly established.[5] *See Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010). However, the Court has discretion to decide, in light of the particular facts and circumstances of the case at hand, the order of the analysis. *Pearson*, 555 U.S. at 236.

---

[4] In determining whether the Deputies are entitled to qualified immunity pursuant to the Hensleys' appeal, however, we must determine whether the Deputies' actions contributed to a violation of the Hensleys' Fourth Amendment rights under clearly established law and we have, in this connection, fully considered the Deputies' pertinent arguments. *See Wheeler*, 660 F.3d at 941.

[5] In some instances this court considers a third inquiry, which is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers v. Aey*, 319 F.3d 843, 846 (6th Cir. 2003) (internal quotation marks omitted).

To be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing" violates federal law. *Anderson*, 483 U.S. at 640. While the pre-existing controlling law need not have held that the identical conduct is unlawful to overcome qualified immunity, "'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.'" *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515 (6th Cir. 1997) (quoting *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848 (citing *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002)).

### a. *Constitutional Violation*

The Hensleys claim that the Deputies' participation in Gassman's repossession violated the Fourth Amendment by transforming the repossession into an unreasonable seizure.[6] The Fourth Amendment's prohibition of unreasonable seizures extends to seizures of property regardless of whether the possessor has a privacy interest in the property. *See Soldal v. Cook Cnty.*, 506 U.S. 56, 62-63 (1992) (noting that "our cases unmistakably hold that the Amendment protects property as well as privacy"); *United States v. Dietz*, 577 F.3d 672, 687 (6th Cir. 2009) ("The Fourth Amendment protects a person's right to his personal property without interference from the police absent consent or reasonable suspicion or probable cause that a crime has been, will be, or is

---

[6] The Deputies state in a footnote that "[i]t is arguable as to whether Sheila Hensley has standing to bring a Fourth Amendment violation claim resulting out of the alleged seizure of a vehicle that is admittedly owned [sic] Hensley, Sr., not her." (Defs.' 2d Br. at 26 n.9.) They cite no authority in support of this proposition. Moreover, they have waived the argument by failing to develop it. *See United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997))).

being committed."). Property is seized "when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal*, 506 U.S. at 61 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). A constitutional violation occurs only where the seizure is objectively unreasonable, *United States v. Place*, 462 U.S. 696, 701 (1983), a determination that entails a "careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)).

Gassman sought to repossess the Hensleys' Buick pursuant to section 9-609(2) of Michigan's version of the Uniform Commercial Code, which authorizes a creditor to use self-help, i.e., without a court order, to repossess collateral if it can be accomplished without breaching the peace. *See* M.C.L. § 440.9609(2) (allowing "a secured party [to] proceed . . . without judicial process if it proceeds without breach of the peace"); *Ansley v. Conseco Fin. Servicing Corp.*, No. 232266, 2002 WL 31955217, at *2 (Mich. Ct. App. Dec. 17, 2002) (per curiam) ("In Michigan, a secured party to a retail installment contract may avail itself of self-help repossession provided that it does not breach the peace."). A self-help repossession is a civil matter generally considered to be a "purely private action." *United States v. Coleman*, 628 F.2d 961, 963 (6th Cir. 1980).

In cases such as this, where the plaintiff seeks to hold government actors liable for participation in a repossession, state action is usually the central issue. *See, e.g.*, *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 512 (5th Cir. 1980) (dismissing for lack of state action the plaintiffs' § 1983 claim arising out of a repossession); *Jones v. Gutschenritter*, 909 F.2d 1208, 1212-13 (8th Cir. 1990) (finding an issue of fact as to whether the police officer intervened and aided in the disconnection of the plaintiff's electrical service). Governmental actors such as the Deputies

> normally can be held responsible for a private decision only when [they have] exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.

*Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (internal citations omitted). The existence of state action is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939(1982).

As a starting point, we note that a police officer's presence during a repossession solely to keep the peace, i.e., to prevent a violent confrontation between the debtor and the creditor, is alone insufficient to convert the repossession into state action. *Coleman*, 628 F.2d at 964; *see also Wright v. Nat'l Bank of Stamford*, 600 F. Supp. 1289, 1295 (N.D.N.Y.), *aff'd without opinion*, 767 F.2d 909 (2d Cir. 1985) ("What is significant about this scenario . . . is the total lack of involvement by the deputy sheriffs. Other than their mere presence, they had absolutely no involvement in the repossession."). This holds true even where the officer interacts with the parties in the performance of official police functions. *See Barrett v. Harwood*, 189 F.3d 297, 303 (2d Cir. 1999) (an officer who told the debtor that the repossession was a civil matter in which he could not get involved and, after the debtor struck the creditor, that the debtor would be going to the back seat of the officer's car if he started any trouble, was acting solely as a peace officer); *Abbott v. Latshaw*, 164 F.3d 141, 147 (3d Cir. 1998) (officers called to the scene of a repossession to check a party's paperwork were not engaged in state action causing a deprivation of a property interest). On the other hand, the likelihood that state action will be found increases when officers take a more active role in the repossession. "At some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983); *see also Mitchell v. Geida*, 215 F. App'x 163, 165 (3d Cir. 2007) (an officer's presence at a repossession may constitute state action if "accompanied by affirmative intervention, aid, intimidation, or other use of power which converts him from a neutral third party to, in effect, an assistant of the repossessing party").

An officer's conduct can facilitate a repossession in various ways, such as through active intervention and assistance. *Menchaca*, 613 F.2d at 513. For example, in *Cochran v. Gilliam*, 656 F.3d 300 (6th Cir. 2011), a case involving an eviction, this

court held that the defendants took an active role in the seizure of the plaintiff's personal property by carrying items out of the house and assisting the landlords in loading the plaintiff's property into a truck. *Id.* at 308. Similarly, in *Abbott v. Latshaw*, 164 F.3d 141 (3d Cir. 1998), the court found that an officer affirmatively intervened such that a jury could find state action:

> Lieutenant George did not remain neutral, but advised Latshaw that she had a right to immediate possession of the van. Lt. George also ignored [the possessor's attorney's] ardent protest of the seizure, and threatened to arrest [the attorney] if he did not move his car to make way for Latshaw. Although he was not the instigator, a jury could find that Lt. George, by his conduct, joined forces with Diehl in the unconstitutional deprivation, going beyond the permissible conduct outlined in *Menchaca*.

*Id.* at 147. Even without active participation, courts have found that an officer's conduct can facilitate a repossession if it chills the plaintiff's right to object. As numerous state court cases and secondary authorities have recognized, an objection, particularly when it is accompanied by physical obstruction, is the debtor's most powerful (and lawful) tool in fending off an improper repossession because it constitutes a breach of the peace requiring the creditor to abandon his efforts to repossess.[7] A police officer's arrival and close association with the creditor during the repossession may signal to the debtor that

---

[7] *See Kensinger Acceptance Corp. v. Davis*, 269 S.W.2d 792, 794 (Ark. 1954) (noting a creditor's right to peaceably repossess, "but if the buyer objects and protests against the seller's retaking the property, and obstructs him in so doing, it is the duty of the seller to resort to legal process to enforce his rights to repossession" (quoting 9 A.L.R. 1180 (1920))); *Nixon v. Halpin*, 620 So. 2d 796, 798 (Fla. Dist. Ct. App. 1993) ("The owner of the vehicle had a right to object to DCI's attempted repossession of the collateral. If DCI had not already peaceably removed the vehicle when the owner objected, it's [sic] continuation with the attempt at repossession was no longer 'peaceable and without a breach of the peace.'"); *Morris v. First Nat'l Bank & Trust of Ravenna*, 254 N.E.2d 683, 686 (Ohio 1970) (holding that "when appellee's agents were physically confronted by appellant's representative, disregarded his request to desist their efforts at repossession and refused to depart from the private premises upon which the collateral was kept, they committed a breach of the peace"); *Westerman v. Or. Auto. Credit Corp.*, 122 P.2d 435, 443 (Or. 1942) ("If the mortgagor or conditional buyer resists and places his body in a position which obstructs the mortgagee or vendor so that in order to take the chattel he must necessarily apply force, however slight, to the person, then he must desist and resort to legal process."); *Stone Mach. Co. v. Kessler*, 463 P.2d 651, 654 (Wash. Ct. App. 1970) (noting the debtor's right to "obstruct, by all lawful and reasonable means, any attempt by [the creditor] to forcibly repossess the tractor," and neither threat of violence nor physical resistance was required to invoke the creditor's corresponding duty to retreat); *see generally* 4 James J. White & Robert S. Summers *Uniform Commercial Code* § 34-8 at 447 (6th ed. 2010) ("The debtor's opposition, however slight and even if merely oral, normally makes any entry or seizure a breach of the peace."); Carolyn L. Carter, *Repossessions* § 6.4.4.3 at 226 (7th ed. 2010) (noting that "once the debtor objects and instructs the creditor to leave the premises, the creditor becomes a trespasser"); 11 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 9-609:11 (3d ed. 2007) ("Case law is clear that if the debtor threatens to physically prevent the repossession, the secured party must not proceed with the repossession.").

the weight of the state is behind the repossession and that the debtor should not interfere by objecting. *See Booker v. City of Atlanta*, 776 F.2d 272, 274 (11th Cir. 1985) ("Even if a jury were to find that Couvillion did not actively assist with the repossession, it nevertheless could find that Couvillion's arrival with the repossessor gave the repossession a cachet of legality and had the effect of intimidating Booker into not exercising his right to resist, thus facilitating the repossession."); *Jones*, 909 F.2d at 1213 (holding that a jury could conclude that the officer's presence with the landlord while the landlord disconnected the tenant's electricity "could have engendered fear or intimidation," causing the tenant to refrain from exercising his right to resist the improper disconnection).

Perhaps the most helpful case is *Barrett v. Harwood*, 189 F.3d 297 (2d Cir. 1999), in which the Second Circuit described the cases as falling along a spectrum of police involvement. *De minimis* police involvement not constituting state action is at one end of the spectrum. As an example, the *Barrett* court cited *United States v. Coleman*, 628 F.2d 961 (6th Cir. 1980), in which this court held that officers who were parked down the street and around the corner from the debtor's residence and never left their cruiser during the repossession neither encouraged nor directed the repossession and were not indispensable to its success. *Id.* at 964. Further along the spectrum, the *Barrett* court observed, are cases such as *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir. 1980), involving more than police presence that does not amount to state action. *Id.* In *Menchaca*, the officers arrived on the scene in the middle of the repossession, told the debtor that he could be arrested if he continued to use loud, abusive language, and departed after the situation calmed down but before the repossession was completed. The Fifth Circuit held that this activity was not intervention or aid in the repossession. *Menchaca*, 613 F.2d at 510.[8] Finally, the *Barrett*

---

[8]The Fifth Circuit decided *Menchaca* in the context of a Rule 12(b)(1) dismissal for lack of jurisdiction. Following an evidentiary hearing, the district court found the defendants' version of events credible and concluded that it lacked subject matter jurisdiction because there was no state action. *See* 613 F.2d at 511-12. The plaintiffs had testified the officers told them that they would have to let the repossessors take the vehicle and that they would arrest the husband if he gave them any more trouble, *see id.* at 514, but because the district court was the factfinder and credited the defendants' testimony, the plaintiffs' testimony did not factor into the analysis.

court observed that cases finding state action, or at least a jury issue, comprise the other end of the spectrum. Among other cases, the *Barrett* court cited *Soldal v. County of Cook*, 942 F.2d 1073 (7th Cir. 1991) (*en banc*), *rev'd on other grounds*, 506 U.S. 56 (1992). In *Soldal*, at the request of the trailer park owner, a deputy sheriff arrived at the plaintiff's mobile home with two trailer park employees and told the plaintiff that he was there to ensure that the plaintiff did not interfere with the eviction, which was illegal because no court order had issued. The court found the deputies' actions sufficient for state action because they prevented the plaintiff from exercising his right to resist. *Id.* at 1075.

In the instant case, the Deputies' actions between the time of their arrival and the time Sheila got into the Buick were more than mere police presence and reflect circumstances other courts have found indicative of state action: (1) the Deputies arrived at the Hensley residence with, and at the request of, Gassman; (2) Deputy Scott ordered Hensley Jr., at least once, to move from between the Buick and the tow truck, as Hensley Jr. was attempting to thwart the repossession; (3) the Deputies ignored Hensley Jr.'s demands to leave the property; (4) Deputy Gilbert told Hensley Jr. that Gassman was taking the Buick; and (5) Deputy Scott ignored both Sheila's protest and her explanation and told Sheila that Gassman was still going to take the Buick.[9] *See, e.g.*, *Marcus v. McCollum*, 394 F.3d 813, 821 (10th Cir. 2004). The circumstances of this case are somewhat unique because, rather than dissuading Sheila from objecting, the Deputies' conduct prompted her to do so. We need not dwell on these facts, however, because the Deputies concede that Deputy Scott's act of ordering Gassman to tow the Buick to the

---

[9] The Deputies' assertion that the facts in this case are even less compelling than those in *Haverstick v. Financial Federal Credit, Inc.*, 32 F.3d 989 (6th Cir. 1994), is without merit. While it is true that the police officer in that case arrived at the debtor's business at the same time as the creditor's agents and had a brief discussion with the debtor's representative, nothing in the opinion discloses the nature of the discussion. Moreover, there is no reason to infer, as the Deputies suggest, that the police officer's act of attempting to attract the debtor's agent's attention by tapping on the window did anything to further the repossession. *See id.* at 992. The district court's opinion in *Haverstick* suggests that the debtor's agent actually locked the police officer and the creditor's agents inside the compound with the wrecker, such that the creditor's agents, who drove the wrecker through the locked gate, had unrestricted access to the wrecker without any need for the officer to distract the debtor's agent to allow them to gain access to the wrecker. *See Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 803 F. Supp. 1251, 1255 (E.D. Mich. 1992). Moreover, the primary focus of the plaintiffs' claims in *Haverstick* was on the officer's actions *after* the creditor's agents had completed the repossession and left the scene with the wrecker.

road, which the Deputies claim was necessary to resolve the situation, was state action.[10] (Appellees' 2d Br. at 29 n.10.) More importantly, although the Deputies do not expressly concede the point, it cannot be reasonably disputed that their conduct of breaking the car window, removing Sheila, and ordering her to remove her belongings from the car was state action. Equally clear is that this conduct was not only active participation, but was instrumental to Gassman's success in completing the repossession. Sheila asserted her right to object not only through words, but by physically taking control of the Buick. At that point, Gassman's right to pursue his self-help remedy terminated, and he was required to cease the repossession.[11] Regardless, the Deputies' subsequent actions, which enabled Gassman to seize the Buick sans Sheila, resolved the stalemate in favor of Gassman – the party neither factually nor legally entitled to the Buick.

We are thus left with the question of whether the seizure was unreasonable. On the issue of reasonableness, the Supreme Court has said that the existence of a court order in a case such as this is a game-changer: "Assuming . . . that the officers were acting pursuant to a court order, . . . a showing of unreasonableness on these facts would be a laborious task indeed." *Soldal*, 506 U.S. at 71. Here, of course, there was no court order, and the Deputies were aware of this fact. (Gilbert Dep., R.E. 33-2 at 10 ("I knew it wasn't court ordered. It's civil."); Scott Dep., R.E. 31-5 at 18 (stating that "I did not have any [information suggesting that the repossession was judicially authorized].").) In short, the Deputies knew that: (1) the repossession was a private civil matter; (2) Gassman claimed that he was authorized to repossess the Buick; (3) Sheila disputed Gassman's authority to take the Buick and gave a specific reason why the repossession should not occur; and (4) the Deputies lacked any evidence substantiating Gassman's

---

[10]The Deputies claim that Deputy Scott ordered Gassman to move the Buick because Hensley Jr. had gone inside the house and Deputy Scott feared that Hensley Jr. might retrieve a weapon. The Deputies claim that it is undisputed that Deputy Scott gave the order to Gassman while Hensley Jr. was inside the house, but this assertion is wrong. Hensley Jr. testified that he was outside and heard Deputy Scott tell Gassman to "pull it out." (Hensley Jr. Dep., R.E. 31-7 at 72-73.) Moreover, the Deputies' own report suggests that Hensley Jr. had already exited the house with a phone in his hand at the time Deputy Scott ordered Gassman to pull the Buick to the road. (R.E. 31-2 at 2-3.)

[11]In fact, Gassman and Wottrich had arguably overstayed their welcome by this time because Hensley Jr. had physically obstructed their efforts and ordered them off the property.

claim of authority to repossess the Buick. Given these undisputed facts, a reasonable trier of fact could certainly conclude that the seizure was unreasonable. *Cf. Bumgarner v. Hart*, 316 F. App'x 201, 206 (3d Cir. 2009) ("A reasonable officer, standing in a parking lot, presented with evidence of ownership of a vehicle and a court's finding of probable cause to conclude that the person possessing the vehicle was doing so in derogation of the owner's rights, reasonably could have understood that taking the vehicle from the party in possession and returning it to the owner was not a violation of the Fourth Amendment. Indeed, Judge Wolfson, a United States District Judge, had concluded as much in the [related] case."). Some of the Deputies' actions - e.g., ordering Sheila to exit the Buick to prevent risk of injury to Gassman and Wottrich while they were underneath the vehicle - were arguably in furtherance of their legitimate peacekeeping function. However, their extraction of Sheila from the vehicle after the immediate threat of injury had passed, despite their admitted knowledge that the repossession was not authorized by court order, appears to have been manifestly unreasonable.

The Deputies contend that if they engaged in state action but did not seize the vehicle there was no Fourth Amendment violation. Alternatively, they argue that if they seized the vehicle such seizure was appropriate because the vehicle was an instrumentality of Sheila's criminal offenses. This argument lacks merit because it misconstrues the basis of the Hensleys' claim. The Hensleys "enjoyed a clearly established right not to have property in which [they] enjoyed a lawful possessory interest seized by state action in violation of the constitution." *Haverstick Enters., Inc.*, 32 F.3d at 994 (footnote omitted). As we have explained, the Hensleys claim that the Deputies' actions transformed *Gassman's repossession* into a Fourth Amendment seizure. That there was no seizure by the Deputies themselves, real or imagined, is thus irrelevant.

In a related argument, the Deputies contend that we should deem their actions objectively reasonable because they *could* have seized the vehicle as the instrument of a crime and/or arrested Sheila. This argument, like the previous one, founders on the

erroneous premise that the Hensleys' claim depends on a seizure by the Deputies themselves. The instant claim concerns Gassman's seizure, and as shown above, the Deputies' actions in facilitating the seizure appear to have been objectively unreasonable. The Deputies' involvement in Gassman's seizure constituted the necessary state action to support the § 1983 claim. Moreover, even if the Deputies' hypothetical seizure were relevant, we would have no need to speculate about their subjective intent. *See United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) ("The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted.") (citing *United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980)). The Deputies both told Sheila and Hensley Jr. that Gassman was taking the Buick, and that was the result they delivered in the end.

Finally, the Deputies argue, without much elaboration, that the *Heck* doctrine precludes Sheila from disputing that she used the Buick as an instrumentality of a crime. Pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), a plaintiff may not sue under § 1983 when the basis for the claim necessarily implies the invalidity of a previous state criminal conviction. Sheila is not challenging her conviction, nor does her claim require a finding of lack of probable cause. Her claim is based solely on the seizure by Gassman, which was independent of Sheila's criminal offense. *See, e.g.*, *Karttunen v. Clark*, 369 F. App'x 705, 708 (6th Cir. 2010) (per curiam) (holding that the plaintiff's excessive force claim would not necessarily imply the invalidity of his state conviction for resisting arrest).

Therefore, like the district court but for slightly different reasons, we conclude that the Hensleys have established a Fourth Amendment violation as a matter of law.[12]

---

[12]Because we conclude that Deputy Gilbert engaged in state action by removing Sheila from the Buick, we need not address Deputy Gilbert's separate argument that he did not actively participate in the violation.

**b.** *Clearly Established Rights*

The second prong of the qualified immunity analysis asks whether the right was clearly established. The essential inquiry is whether the defendant had fair warning that his actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The contours of the right must be sufficiently clear to inform a reasonable official that his conduct violates that right, but a prior ruling holding the precise action unlawful is not required. *Anderson*, 483 U.S. at 640.

This court has long recognized that individuals have "a clearly established right not to have property in which [they] enjoy[] a lawful possessory interest seized by state action in violation of the constitution." *Haverstick*, 32 F.3d at 994 (footnote omitted). The Supreme Court's decision in *Soldal*, which was decided in 1992, confirms that state actors violate the Fourth Amendment by taking an active role in private evictions and repossessions when there is no apparent legal basis for such action. *Cochran*, 656 F.3d at 309. Moreover, in *Cochran*, this Court affirmed that the law was clearly established in this respect "well before" the events here at issue. *See id.* at 310.

In light of the foregoing, the Deputies should have known that their conduct, as shown in the record and viewed in the light most favorable to the Hensleys, violated the Hensleys' clearly established rights. Although the determination of whether a police officer's involvement in a repossession or eviction is sufficiently active to amount to state action "is particularly fact-sensitive," *Marcus*, 394 F.3d at 819, this is not a close case: the Deputies' active involvement facilitated the repossession.

The district court concluded that the Deputies are entitled to qualified immunity because they "reasonably, though mistakenly, believed that there was a repossession order even though the Deputy Defendants did not verify the legitimacy of the file in Gassman's possession." It is not clear what the district court meant by this statement, but it is erroneous under any interpretation. First, if the district court meant that the Deputies reasonably but mistakenly believed that Gassman had a court order, this conclusion would be contrary to the record because the Deputies both testified that they knew there was no court order. Second, there was no mistake. The district court

correctly acknowledged that qualified immunity allows for reasonable mistakes by law enforcement officials. *See Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) ("Implicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err. The concept of immunity thus acknowledges that it is better to risk some error and possible injury from such error than not to decide or act at all." (citation and internal quotation marks omitted)). Here, however, there was no "mistake" – the Deputies simply declined to review Gassman's order. Finally, even mistaken reliance on Gassman's order would not have been reasonable, because it was simply an order from the creditor to Gassman to repossess the vehicle. As such, the creditor's order carried no more weight than Gassman's own word which, in the context of this private repossession, the Deputies could not accept over Sheila's competing claim. *See Cochran*, 656 F.3d at 308 (noting that where police officers take an active role in a repossession or eviction, "they are no longer mere passive observers and courts have held that the officers are not entitled to qualified immunity"). Moreover, again, there can hardly be any debate, on the extant facts, that a reasonable jury could find the Deputies' extraction of Sheila from the vehicle she was entitled to possess was unreasonable. Accordingly, the district court erred in its qualified immunity analysis. The Deputies' motion for summary judgment based on qualified immunity should have been denied.

### 2.      Conspiracy Claim

The Hensleys alleged in their First Amended Complaint that the Deputies and Gassman conspired to violate their civil rights by "work[ing] together to unlawfully seize the 2000 Buick LaSabre [sic] from the Hensley's residence." The standard for proving a civil conspiracy claim in the Sixth Circuit is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general

conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). The district court concluded that the Hensleys failed to establish a conspiracy claim because there was no evidence of an unlawful agreement.

Although a plaintiff may rely on circumstantial evidence to establish an agreement among the conspirators, *see Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (citing *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)), the district court correctly concluded that the Hensleys failed to establish an agreement to engage in unlawful action. The Hensleys rely on the Deputies' conduct during the course of the repossession to establish the conspiratorial agreement. However, the Deputies' conduct is just as consistent with independent conduct as it is with a conspiracy. The evidence shows that Gassman called the sheriff's department's central dispatch to request a "civil standby" during the repossession, and he did not request the Deputies by name. There is no indication that when the Deputies met Gassman, they discussed anything other than that the Deputies would follow Gassman to the Hensley residence. As set forth above, police officers may be present during a repossession in order to keep the peace without violating the constitution, and it appears that this is exactly what Gassman and the Deputies had in mind before the Deputies engaged in unconstitutional conduct during the repossession. *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) ("Certainly, much of the plaintiffs' evidence is as consistent with independent conduct as with a conspiracy."). Therefore, the district court properly granted summary judgment on this claim.

## IV. Conclusion

For the foregoing reasons, we: (1) **DISMISS** the Deputies' cross-appeal in Case No. 11-1129 for lack of jurisdiction; (2) **REVERSE** the district court's grant of summary judgment to the Deputies on the Hensleys' Fourth Amendment claim based on qualified immunity; (3) **VACATE** the portion of the district court's order denying the

Hensleys' motion for summary judgment on the Fourth Amendment claim;**13** (4) **AFFIRM** the district court's grant of summary judgment on the Hensleys' § 1983 conspiracy claim; and (5) **VACATE** the portion of the district court's order declining supplemental jurisdiction over the Hensleys' state law claims.

The case is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.

---

**13**The district court denied the Hensleys' motion for summary judgment on the Fourth Amendment claim as the necessary consequence of its ruling that the Deputies were entitled to qualified immunity. Now that the latter ruling is reversed, we simply vacate the denial of the Hensleys' motion for summary judgment and remand for further proceedings, which may include "reconsideration" of the Hensleys' motion in the first instance.