NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0251n.06
Case No. 18-4160

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | May 10, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| CHARLES FORTNEY, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

_____/

Before: GUY, SUTTON, and NALBANDIAN, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Defendant Charles Fortney appeals his conviction for possessing an unregistered firearm. He pleaded guilty pursuant to a Rule 11 agreement, waiving his right to appeal most issues. But he reserved his right to appeal the district court's denial of his motion to suppress evidence. The suppression matter forms the basis of this appeal. We now reverse.

## I. BACKGROUND

Most of the evidence revealing what happened to Fortney comes from a state court proceeding. Before the United States filed the indictment in this case, the State of Ohio prosecuted Fortney for criminal trespass based upon his having a weapon at the warehouse. He moved to suppress evidence and the Ohio court held a hearing. Fortney, his former boss, and a police officer

testified at the hearing. That same testimony formed the relevant evidence in Fortney's federal suppression motion, which we now review.

## A. The Search

In early 2018, Fortney was working for ALDI grocery stores in the warehouse of one of its distribution centers. Michael Aschbrenner was in charge of the warehouse and was Fortney's superior. In February 2018, warehouse workers told Aschbrenner that Fortney had harassed a coworker. They also told him that Fortney was rumored to keep a gun in the backpack he brought to work each day. Aschbrenner resolved to speak with Fortney about the harassment. Due to the gun rumor, however, he first got in touch with the local police department and arranged for officers to be present on the day he met with Fortney.

The meeting took place on an early Monday morning. Fortney arrived at his usual time of 4:00 a.m. and began working. Three police officers arrived at another part of the warehouse two hours later and Aschbrenner ushered them into an office adjacent to his own. Meanwhile, Fortney's supervisor, John King, told Fortney that Aschbrenner wanted to see him. King escorted Fortney to Aschbrenner's office. Inside the office, Aschbrenner confronted Fortney about the accusations and after twenty minutes or so, he told Fortney that he was fired and that this would be his last day. Aschbrenner later confirmed that, at this point, Fortney was terminated. Aschbrenner then told Fortney about the gun rumor, informed Fortney that he needed to search his backpack, and disclosed that police officers were standing by for safety purposes. According to Fortney, Aschbrenner did not ask him whether he indeed brought in a gun, and both of them agreed that Fortney said he did not consent to a search. Specifically, Fortney testified as follows during cross examination:

FORTNEY: After I was terminated, [Aschbrenner] tried to tell me he was going to search my backpack. And I said that I was no longer an employee and that I do not consent to a search.

PROSECUTOR: You didn't want him to search the backpack, right?

FORTNEY: No, I did not.

PROSECUTOR: Because you had a gun in the backpack?

FORTNEY: No. Because I believe that's my right.

Fortney left the office abruptly but was immediately stopped by the police officers, who by this time had emerged from the other office and were milling about in the hall. Aschbrenner testified that he had asked the police officers to prevent Fortney from going to the locker room and that they did so. One of the police officers testified that, "by chance we just kind of were all in a triangular around him, and he stopped and just sort of -- you know, just kind of put his hands up and stopped." Fortney confirmed that they were in a triangle formation around him, and added that the officers "all had their hands on their firearms not drawn, which I then put my hands up and I said -- you know, I put my hands out in front of me because I did not want to cause them to have any issue to pull a firearm." Fortney explained that the officers were acting "timid" and that he "wasn't sure of the situation, so [he] stood still and [] wasn't able to go anywhere." He also testified that he did not think he could leave because he "couldn't go through the police officers" without bumping into them and could not leave the warehouse without first retrieving his bag, which contained his driver's license and his keys.[1] He later testified that he believed he was under arrest.

---

[1] There was no testimony at the state court's suppression hearing that the keys were in the bag. But at the motion hearing before the district court, Fortney, not then under oath, averred that they were. The district court considered this additional detail in making its decision and we thus do likewise.

Fortney, like other workers at the warehouse, kept his backpack in a locker elsewhere in the building, and secured it with his own lock. After Fortney halted in front of the officers outside Aschbrenner's office, everyone—Fortney, Aschbrenner, King, and the three officers—headed toward the locker. Aschbrenner and Fortney walked side-by-side while the police officers followed behind. When they arrived at the locker, Aschbrenner asked Fortney to unlock it, and he complied. Aschbrenner then removed the backpack and began going through the pockets. During the search, Fortney stood with his back to the exit while Aschbrenner and the officers stood in front of him, about six to eight feet away.

At the outset of the search, one of the officers asked Fortney whether there was a firearm in the bag. Aschbrenner did not remember how Fortney responded, but one officer testified that Fortney told them no, there was no firearm in the bag. Fortney, on the other hand, testified that he told the officer there was no firearm *to the best of his knowledge*. According to Fortney, he did not believe he had a firearm in his bag because he usually took it out of his bag when he was out with his children. All agree, however, that Fortney advised them that there was a single, .45 caliber bullet or casing in one of the pockets.[2] This prompted one of the police officers to ask Fortney if he had "a permit for the ammunition." Fortney confirmed he had a permit in his wallet and identified the pocket where it could be found. When Aschbrenner found Fortney's wallet, he gave it to the officer to "identify if [Fortney] had the proper permit." The officers found the permit and examined it while Aschbrenner continued unzipping pockets.

The final pocket Aschbrenner unzipped contained the firearm. Aschbrenner recognized it was a gun but testified, "I obviously didn't want to pull the gun out myself, so I showed it to the

---

[2] It is not clear from the testimony whether it was merely a casing or a bullet. Fortney described it as, "a piece of artwork, I guess you could say, that people usually put a chain through."

officer and allowed him to obviously take it out of there for security." The gun had a loaded, 30-round magazine attached and there were two more loaded, 30-round magazines in the same pocket. One of the officers, or perhaps Aschbrenner, removed the extra magazines, too. The officers asked Fortney why he had not told them about the gun, and he told them he had forgotten about it.

At this point, Aschbrenner told Fortney he was not allowed back at the warehouse and the officers escorted him out to his truck. The officers asked Fortney if they could search the truck for additional weapons. He permitted the search, but the police found no other weapons. The officers kept the gun from Fortney's bag and issued him a receipt for it. Fortney then left.

### B. The Proceedings

Two months after the search, a federal grand jury indicted Fortney for possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d). Fortney never contested that the gun found in his bag was unregistered. But early in the case, he moved to suppress "all evidence and statements obtained from [him] stemming from" the search. The government filed a response and the court held a hearing. At the hearing, and after argument from both sides, the court denied the motion from the bench and memorialized the decision in a written opinion soon after. Fortney entered into a plea agreement a few days later.

## II. STANDARD OF REVIEW

We review the district court's decision under two standards of review. We review its factual findings for clear error and review its conclusions of law de novo. *United States v. Ursery*, 109 F.3d 1129, 1132 (6th Cir. 1997). In doing so, we view the evidence "in the light most likely to support the district court's decision." *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) (quoting *United States v. Gomez*, 846 F.2d 557, 560 (9th Cir. 1988)). "A factual finding will only be clearly erroneous when, although there is evidence to support it, the reviewing court

on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ursery*, 109 F.3d at 1132.

## III. DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it is enforceable against a state through the Fourteenth Amendment's Due Process Clause. U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The right "proscrib[es] only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *United States v. Jacobsen*, 466 U.S. 109, 113–14 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). The obverse is that a private party's conduct can be "imputed to the government" when the conduct is made possible by government officers. *United States v. Booker*, 728 F.3d 535, 541 (6th Cir. 2013).

### A. State Action

The district court denied the motion to suppress on the grounds that there was no relevant state action. We must therefore determine whether the search of Fortney's bag constituted "state action" or merely private action at which government actors (the police) were simply present. In cases past, we have used several different tests to make this determination. At the district court, the parties suggested two of those tests: the state-compulsion test and the nexus test, sometimes called the symbiotic-relationship test. The district court applied both tests and also analyzed the case under an "agency test" that we have used when evaluating actions committed solely by a private party. *See, e.g.*, *United States v. Bowers*, 594 F.3d 522, 525–26 (6th Cir. 2010).

### 1. The Agency Test

The agency test calls us to look at two factors: "(1) the government's knowledge or acquiescence to the search, and (2) the intent of the party performing the search." *Id*. at 526 (quoting *United States v. Hardin*, 539 F.3d 404, 418 (6th Cir. 2008)). "If the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, then the private party is not an agent of the government." *Id.* (quoting *Hardin*, 539 F.3d at 418) (emphasis omitted). No one contends that the police officers were attempting to collect evidence and the record clearly establishes that Aschbrenner searched Fortney's bag out of a personal concern for safety. The district court properly determined that Aschbrenner's actions were not state actions under the agency test.

### 2. The State-Compulsion Test

Under the state-compulsion test, the state must "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). As applied here, that means considering whether the searcher, not the searched, was coerced by the state. Again, the record is clear that Aschbrenner accompanied Fortney to his locker and searched the bag due to his own personal concern about safety and did so of his own volition. There is no evidence that the state, vis-à-vis the police officers, encouraged or coerced Aschbrenner to do anything. The district court properly determined that Aschbrenner's actions were not state actions under the state-compulsion test.

### 3. The Symbiotic Relationship or Nexus Test

"Under the symbiotic relationship or nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of

the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). The test requires demonstrating that the state was "intimately involved in the challenged private conduct" such that the conduct can "be attributed to the state[.]" *Id.* The district court found that Fortney did not satisfy this test because the "three officers on site did not play an active role in the search." Here we part ways with the district court.

The facts of this case align closely with a body of case law concerning repossessions of personal property where police officers are on hand to keep the peace. Fortney drew this connection at the district court and revives the comparison on appeal. He specifically likens his case to one of our prior decisions about a vehicle repossession gone awry, *Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012). The government agrees that this is a generally correct approach for looking at police action, and we too find the comparison useful.

By way of background, repossession cases arise when creditors invoke self-help remedies. Many states adopt the Uniform Commercial Code provision that permits a private secured party to take possession of collateral "without judicial process, if it proceeds without breach of the peace." U.C.C. § 9-609 (2017). Generally, states that adopt this rule require the creditor to "abandon his efforts to repossess" when the debtor objects to the repossession, "particularly . . . by physical obstruction[.]" *Hensley*, 693 F.3d at 689–90. Creditors, realizing that tensions may run high, sometimes request a police officer to be present, and we have observed that "a police officer's presence during a repossession solely to keep the peace, i.e., to prevent a violent confrontation between the debtor and the creditor, is alone insufficient to convert the repossession into state action." *Id.* at 689. But police actions fall on a spectrum, and as the "officers take a more active role in the repossession," the likelihood that we will find state action increases and

"[a]t some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action." *Id.* (quoting *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983)).

Despite the useful parallels, this is not a repossession case. There are salient differences. First, Aschbrenner was not acting under a statutory right to search Fortney's bag without first obtaining his consent. He was acting as Fortney's former employer and ALDI's current employee charged with ensuring a safe workplace. His authority, if any, to search Fortney's bag had to therefore stem from one or both of those roles. Second, unlike a creditor who encounters resistance, Aschbrenner was not statutorily obligated to cease his efforts once Fortney opposed them. With those caveats in mind, we take a closer look at repossession cases and their likeness to the case at hand.

Although Fortney points us to *Hensley*, we find another repossession case aligns more closely to the facts here and reveals an important difference. In *United States v. Coleman*, a man named Clarke was hired to repossess a truck. 628 F.2d 961 (6th Cir. 1980). He planned to do it discretely one night but before doing so he made arrangements with the local police. At his request, the police agreed to be on hand in case trouble arose. Clarke informed them that after he repossessed the truck, he intended to "stop off at the police station to deposit any personal effects of [the debtor truck owner]'s that he might find in the truck." *Id.* at 962. This was because "his authority was limited to repossessing the truck; his authorization did not extend to the seizure of personal property inside the truck"; and also, he planned to take the truck 200 miles away, so "[d]epositing any personal effects at the police station would spare [the owner] the inconvenience of [a long drive] to retrieve them." *Id.* at 962–63. The repossession went smoothly: the police "parked down the street and around the corner" while Clarke "entered the truck, started the engine,

and drove away without incident." *Id.* at 963. But once inside the truck, Clarke noticed "a quantity of what appeared to be marijuana on the seat, and the butt end of a rifle protruding from behind the seat." *Id.* After rendezvousing at the police station, Clarke told the police officers "that he had found a rifle in the truck," and "pulled the seat up to show them the gun and then handed the gun to the officers." *Id.* He "then opened a briefcase that he had found in the truck and discovered a shotgun inside that briefcase. Clarke then handed the open briefcase containing the shotgun to the officers." *Id.* The truck's owner was later charged with possessing an unregistered firearm (the shotgun from the briefcase) and he moved to suppress the evidence.

The district court found that the search was unlawful and thus granted the motion and suppressed the shotgun as evidence. *Id.* The court reasoned that "Clarke would not have repossessed the truck at the time and place he did but for the police assurances of assistance," and thus concluded "that the repossession was accomplished by virtue of state power." *Id.* The court also "held that because the seizure of the truck was the product of police action, the subsequent search was not a private search." *Id.* at 964.

We reversed, first explaining that the police's involvement in the seizure of the truck amounted to "mere acquiescence" which is insufficient to establish state action. *Id.* (relying on *Flagg Bros. v. Brooks*, 436 U.S. 149 (1978)). In reaching that conclusion, we emphasized that the police's role was confined to "passive surveillance"—they parked down the street and around the corner—in contrast to cases where police accompanied the repossessor in his mission. *Id.* at 964 n.1 (citing *Walker v. Walthall*, 588 P.2d 863 (Ariz. 1978) and *Stone Machinery v. Kessler*, 463 P.2d 651 (Wash. Ct. App. 1970) (both observing that the presence of police tended to intimidate the debtor and thus rose to state action)). We then went on to explain that by simply receiving the items from Clarke, rather than independently searching for them, the police were exercising

"community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 965 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).

The search of Fortney's bag parallels the search of the truck in *Coleman*. In both cases, a private party performed the search for reasons of his own. Right or wrong, those searches were not at the police's behest nor performed to collect evidence of a crime. Both cases also involved a certain measure of caretaking. In *Coleman*, the police's involvement allowed Clarke to return the property to its rightful owner without burdening the owner with a lengthy trip or inviting a violent confrontation. Here, the police took possession of the gun, thereby ensuring that the recently terminated Fortney left without using it.

This case breaks with *Coleman*, however, in the commencement of the search. In *Coleman*, Clarke took control of the truck and searched it without any aid from the police officers and unbeknownst to the owner. Here, the record reveals that Fortney unambiguously objected to the search. By everyone's account, Fortney attempted to promptly and independently retrieve his property after he was fired but stopped this effort because three police officers triangulated around him. Then, as the three officers looked on—and in contrast to his earlier refusal—he allowed Aschbrenner to search every pocket of his bag, remove his wallet, and hand the wallet to the police so that they could go through its contents.

It is worth pausing to recognize the circumstances that were at play. The Supreme Court has repeatedly emphasized that divining state action is a case-by-case inquiry that requires us to pay close attention to the facts. *See, e.g.*, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 726 (1961) (recognizing that state action "can be determined only in the framework of the peculiar facts or circumstances present"). Here, a recently fired employee was heading abruptly toward a

bag believed to contain—and in truth did contain—a gun. Slowing him down and supervising his departure were fully consistent with simply "prevent[ing] a violent confrontation[.]" *Hensley*, 693 F.3d at 689. Under the circumstances, these actions would not necessarily slide the police conduct into the state-action side of the spectrum.

The officers' presence, however, did more than prevent violence. It enabled the search. In *Hensley*, we observed that "[e]ven without active participation . . . an officer's conduct can facilitate a repossession if it chills the [debtor]'s right to object." 693 F.3d at 689. "A police officer's arrival and close association with the creditor during the repossession may signal to the debtor that the weight of the state is behind the repossession and that the debtor should not interfere by objecting." *Id.* at 690 (citing *Booker v. City of Atlanta*, 776 F.2d 272, 274 (11th Cir. 1985) and *Jones v. Gutschenritter*, 909 F.2d 1208, 1213 (8th Cir. 1990)). Fortney testified that as he stood in front of the officers, he believed he was under arrest. Although the district court seems to have found that Fortney "was free to leave the building, albeit without his backpack," in this context what matters is what a reasonable person in Fortney's position would have believed.[3] *Cf. Howes v. Fields*, 565 U.S. 499, 509 (2012) (observing that in the context of *Miranda* warnings, courts begin by determining whether a reasonable person would have felt he was free to leave). Given the police officers' involvement in Aschbrenner's search of the bag and Fortney's yielding to the search despite his clear protestations, we cannot conclude that the police were mere bystanders

---

[3] Given the deferential standard of review that guides us on findings of fact, we stress a distinction. Fortney had argued that the police officers "exercised coercive power by not allowing [him] to go to the locker, grab his bag, and leave the premises." The district court observed that the argument was "belied by the record," given that Aschbrenner and an officer later "testified that Defendant was free to leave the building, albeit without his backpack" and "Defendant does not deny this." To be clear, Fortney did not deny that this was their testimony, or that at the time they believed in their own minds that he was free to go. But he did testify, and has always asserted, that as he stood in front of the officers, *he* believed he was under arrest.

who simply surveilled a private action. Fortney changed his behavior and acquiesced to the search because the police were present and supporting Aschbrenner's pursuit of the bag. The search would not have occurred but for the police officers' active involvement. We therefore conclude that Aschbrenner's search constituted state action.

## B. Reasonableness

The government insists that even if there was state action here, the search was reasonable and thus does not run afoul of the Fourth Amendment. Specifically, the government contends that the police were acting in their community caretaking function. But the government failed to raise this argument in the district court and thus forfeited it. *See Hunter v. United States*, 160 F.3d 1109, 1113 (6th Cir. 1998) (recognizing that the government can forfeit an argument "by failing to raise it in a timely fashion"). We sometimes make exceptions to this rule, but only for "exceptional cases"—and this is not one of them. *See United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006).

## IV. CONCLUSION

The district court denied Fortney's motion because it found there was no state action. As explained, we disagree. We therefore VACATE the district court's order granting the motion to suppress and REMAND the case for further proceedings consistent with this opinion.