# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 70368-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| VASILIY SLOBODYANYUK, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 5, 2013 |
| | ) | |

LAU, J. — Vasiliy Slobodyanyuk appeals his assault, theft, and identity theft convictions. He argues that insufficient evidence supports the convictions. Finding no error, we affirm.

## FACTS

The State charged Slobodyanyuk with second degree theft (count 1), third degree assault (count 2), second degree possession of stolen property (count 3), and second degree identity theft (counts 4–6). Testimony at trial established the following facts.

Brandon Kilian works for Nighthawk Protection as a private security guard. His duties include patrolling businesses and apartment complexes, looking for suspicious

activities, and responding to noise complaints. While on duty, he drives a Ford Crown Victoria that is marked with Nighthawk's logo and the words "Rapid Response" on the back with the company's phone number. Kilian's uniform consists of black pants with blue stripes, tan shirt, badge, and patches that say "Nighthawk Protection."

The night of April 23, 2011, Kilian was patrolling the Madison Park apartment complex in Clark County on the 7:30 PM to 6:00 AM shift for Nighthawk. The complex had an entry and exit gate requiring a pass code for access. That day the gate was broken and stuck in the open position. Consequently, apartment management asked Nighthawk to conduct extra patrols around the complex.

Kilian conducted six patrols of the complex the night of April 23. Approximately two hours elapsed between each patrol. Kilian conducted his sixth and final patrol around 3:30 AM. At that time, he noticed a black car double-parked behind several other cars at the back of the parking lot about a quarter mile from the complex's front gate. The black car was not there during Kilian's previous patrols of the parking lot. The car was about 40 yards from the apartment buildings, and the parking lot in that area was "extremely dark" because the nearby light pole was burned out. RP (Jan. 30, 2012) at 136-37.

Kilian exited his patrol car and approached the black car. He heard a noise that sounded like a trunk or car door closing and saw a man, later identified as Vasiliy Slobodyanyuk, standing next to the black car. No one else was nearby. Kilian asked Slobodyanyuk for his name and he replied, "William Brown." RP (Jan. 30, 2012) at 138-39. When Kilian asked what he was doing, he said he was waiting for a friend. Kilian

-2-

asked for the friend's name and where the friend lived. Slobodyanyuk said, "I don't know." RP (Jan. 30, 2012) at 140.

Kilian could see through the black car's window to the inside and noticed "a bunch of miscellaneous items" in the car, including multiple stereo faceplates, a laptop case, and miscellaneous electronics. RP (Jan. 30, 2012) at 140. Kilian asked Slobodyanyuk if he would open his trunk and he replied, "No problem." RP (Jan. 30, 2012) at 141. Inside the trunk, Kilian saw a toolbox with latex gloves on top. Based on all of the circumstances, Kilian believed Slobodyanyuk was car prowling. Kilian asked Slobodyanyuk to walk with him to his patrol car. On the way, Kilian used his handheld radio to contact his dispatcher.[1] Dispatch advised Kilian that the Vancouver police would arrive in approximately 10 minutes. Slobodyanyuk grew agitated and said, "I'm just going to go." RP (Jan. 30, 2012) at 143. Kilian told Slobodyanyuk to "hang out just for a couple more minutes until the police got there." RP (Jan. 30, 2012) at 144. Kilian placed his hand on top of Slobodyanyuk's right hand, which was on Kilian's patrol car. Kilian again contacted dispatch and asked if the police could come faster. The moment Kilian completed this transmission, Slobodyanyuk turned and swung at Kilian's face with his left hand. Kilian ducked, but Slobodyanyuk's left fist grazed Kilian's left eyebrow.

Kilian grabbed Slobodyanyuk and both men tripped and fell to the ground. Slobodyanyuk then jumped up and ran back to the black car. Kilian followed and tried to grab Slobodyanyuk as he was getting into the car, but he lost his grip and Slobodyanyuk drove away. Kilian reached for his radio and found it missing. Kilian had

---

[1] Kilian's Kenwood radio, issued to him by Nighthawk Protection, had an antenna on top, several different buttons, volume on one side, and different channels on the top.

previously provided dispatch with the black car's make, model, and license plate number. Kilian ran back to his patrol car and used its bolted-in radio to advise dispatch that Slobodyanyuk was driving off the property.

Vancouver Police Department (VPD) Officer Todd Schwartz responded to Kilian's dispatch call. At about 3:45 AM, he located a car matching Kilian's description on the road near the Madison Park apartment complex. Officer Schwartz followed the car as it made several turns and eventually pulled into a residential driveway. Officer Schwartz exited his patrol vehicle and approached the car in the driveway. The items in the car initially obstructed his view of the driver. Officer Schwartz contacted the driver, later identified as Slobodyanyuk, through the driver's side window and asked if he lived at the residence. Slobodyanyuk responded, "No." RP (Jan. 30, 2012) at 187. Officer Schwartz could hear what he described as "police radio traffic" coming from Slobodyanyuk's car. Officer Schwartz ordered Slobodyanyuk to get out of the car and then noticed a portable police-style radio sitting on the driver's seat. The radio was turned on. Kilian arrived at the scene and identified the driver as the person who swung at him. He also identified his radio, which had been missing since Slobodyanyuk fled the apartment complex.

VPD Sergeant John Schultz arrived at the scene to assist Officer Schwartz. By that time Slobodyanyuk was detained in handcuffs outside Officer Schwartz's patrol car. Sergeant Schultz placed Slobodyanyuk in his own patrol car. Sergeant Schultz then looked through the window of Slobodyanyuk's car and saw a police radio in the driver's seat, a Mac laptop between the driver and passenger seats, a large flat screen TV and several other electronics in the backseat, a piece of luggage in the area above the

backseat, and another piece of luggage in the front passenger seat. From outside the car, Sergeant Schultz could read the names on the luggage tags: "Jim Lowne" and "Jolene Conzatti." RP (Jan. 30, 2012) at 203. Sergeant Schultz later learned that Lowne and Conzatti's residence was burglarized while they were out of town the weekend of April 23-24, 2011.

VPD Officer Spencer Harris obtained a search warrant for Slobodyanyuk's car. Inside the car he found several items including a Samsung Blu Ray disc player, a stereo, speakers, a 47-inch LG flat screen TV, a laptop computer, and luggage. A bag found above the backseat contained vintage fishing gear belonging to Lowne. Officer Harris also found a small box in one of the bags that contained Lowne's diamond and gold ring. Officer Harris later determined the items were stolen from Lowne and Conzatti's residence during the burglary. Lowne valued the flat screen TV at $1,200, the Blu Ray disc player at $250, the stereo with speakers at $500, the laptop at $1,200, the fishing gear at $900, and the ring at $24,000.

Officer Harris also searched the trunk. There he found identification cards, credit cards, checkbooks, and other personal documents belonging to three people—Asya Carducci, Nicola Carducci, and Victoria Overholser. Officer Harris found no accompanying purses or wallets. Police later learned that Asya and Nicola Carducci's residence and Victoria Overholser's residence were burglarized between April 17 and April 18, 2011. Asya Carducci testified that she last saw her identification card, bank cards, and checkbook in her purse, which was in her apartment's hallway the night the burglary occurred. When she woke up the next morning, her purse and its contents were missing. Asya's husband, Nicola, testified that his wallet—containing his

-5-

identification and bank cards—was also taken in the burglary. Victoria Overholser testified that her purse, containing her identification and bank cards, was taken when her apartment was burglarized. Overholser's debit card was used at a gas station soon after the burglary.

Slobodyanyuk spoke to Officer Harris on the morning of April 24. He told Officer Harris that he lived in Portland, Oregon. Slobodyanyuk said he was at a party with some friends in Vancouver the night of April 23. He told Officer Harris that he went to the Madison Park apartment complex during the early morning hours of April 24 when some friends called him and asked for a ride because they were drunk. Officer Harris asked him to identify his friends but he refused.

Slobodyanyuk testified at trial. He said he lived in Vancouver, Washington when the crimes were committed. He testified that he was at home asleep on the night of April 23, 2011. He said that he went to the Madison Park apartment complex early in the morning on April 24 because some "acquaintances" called him and said they needed him to "carry something in [his] car." RP (Jan. 31, 2012) at 335. Slobodyanyuk stated that when he arrived at the apartment complex, he met two men who loaded items into his car. He denied knowing that the items were stolen or participating in the burglaries. He said one of the men was nicknamed "Max," "David," or "Danick." RP (Jan. 31, 2012) at 351. The other man was called "Small Guy," "Mali," or "Tim." RP (Jan. 31, 2012) at 352. Slobodyanyuk admitted at trial that the statements he made to Officer Harris on the morning of April 24 were false.

Based on the evidence presented at trial regarding the radio's value, the State asked the court to instruct the jury on third degree theft rather than second degree theft

on count 1.[2] The court also instructed the jury on fourth degree assault in addition to third degree assault on count 2.[3] The jury convicted Slobodyanyuk of third degree theft on count 1 and convicted him of the remaining crimes as charged. The court imposed a sentence at the high end of the standard range. Slobodyanyuk appeals.

## ANALYSIS

Slobodyanyuk argues that insufficient evidence supports his assault, theft, and identity theft convictions.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).[4] "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. Circumstantial and direct evidence are equally reliable. State v. Moles, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Fiser, 99 Wn. App. 714, 719, 995 P.2d 107 (2000).

---

[2] Count 1 alleged theft of Kilian's portable radio.

[3] Count 2 alleged that Slobodyanyuk assaulted Kilian with intent to prevent lawful apprehension or detention.

[4] In determining whether sufficient evidence exists, the reviewing court determines not "whether it believes the evidence at trial established guilt beyond a reasonable doubt," but whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

### Third Degree Assault

Slobodyanyuk does not dispute that he assaulted Kilian with intent to resist Kilian's attempt to apprehend or detain him. See Appellant's Br. at 4. But he claims insufficient evidence supports his conviction because Kilian lacked probable cause to believe Slobodyanyuk was committing a crime and, thus, lacked lawful authority to apprehend or detain him. The State responds that Kilian had probable cause to believe Slobodyanyuk was committing second degree vehicle prowl or second degree possession of stolen property.

The State charged Slobodyanyuk with third degree assault under RCW 9A.36.031(1)(a). Under that subsection, a person is guilty of third degree assault if, under circumstances not amounting to first or second degree assault, he or she "[w]ith intent to prevent or resist the execution of any lawful process or mandate of any court officer or the lawful apprehension or detention of himself, herself, or another person, assaults another." RCW 9A.36.031(1)(a).

This statute's protection extends to private citizens who are lawfully arresting or detaining another person. State v. Mierz, 127 Wn.2d 460, 478, 901 P.2d 286 (1995). A private citizen can make a citizen's arrest "when a felony or a misdemeanor that constitutes a breach of the peace is committed in that individual's presence." State v. Malone, 106 Wn.2d 607, 609 n.1, 724 P.2d 364 (1986). The Restatement (Second) of Torts § 116 (1965) defines breach of the peace as "a public offense done by violence, or one causing or likely to cause an immediate disturbance of public order." See also Stone Mach. Co. v. Kessler, 1 Wn. App. 750, 754, 463 P.2d 651 (1970) (quoting Restatement § 116).

> "To constitute a 'breach of the peace' it is not necessary that the peace be actually broken, and if what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required, nor is actual personal violence an essential element of the offense."

Kessler, 1 Wn. App. at 754 (quoting McKee v. State, 75 Okla. Crim. 390, 132 P.2d 173 (1942)). While "breach of the peace" is required for a citizen to arrest for a misdemeanor, a citizen may arrest for a felony based on reasonable and probable cause to believe the arrested party is guilty of a felony. State v. Jack, 63 Wn.2d 632, 637, 388 P.2d 566 (1964).

Probable cause is not knowledge of evidence sufficient to establish guilt beyond a reasonable doubt but, rather, is "reasonable grounds for suspicion coupled with evidence of circumstances to convince a cautious or disinterested person that the accused is guilty." State v. Bellows, 72 Wn.2d 264, 266, 432 P.2d 654 (1967). We consider the totality of the circumstances when determining whether probable cause exists. State v. Graham, 130 Wn.2d 711, 724, 927 P.2d 227 (1996).

Objective facts and circumstances determine the validity of an arrest. State v. Huff, 64 Wn. App. 641, 646, 826 P.2d 698 (1992). "[A]n arrest supported by probable cause is not made unlawful by an officer's subjective reliance on, or verbal announcement of, an offense different from the one for which probable cause exists." Huff, 64 Wn. App. at 646; see also State v. Stebbins, 47 Wn. App. 482, 485-86, 735 P.2d 1353 (1987) (police arrested suspect for armed robbery; although State failed to present evidence supporting a finding of probable cause for that crime, arrest was held lawful because probable cause existed to support arrest for crime of burglary).

We conclude Kilian had probable cause to believe Slobodyanyuk committed second degree vehicle prowl on the night of April 23, 2011. A person commits second degree vehicle prowl when he or she enters or remains unlawfully in a vehicle with intent to commit a crime against a person or property therein. Former RCW 9A.52.100 (2011). Kilian heard a car door or trunk close and saw Slobodyanyuk standing outside his car, which was double-parked behind two other cars. Slobodyanyuk was in an unlit portion of the parking lot in the early morning hours at a time when the apartment complex's security gate was broken. Kilian saw miscellaneous valuable electronics inside Slobodyanyuk's car and a toolbox and gloves in the trunk. Slobodyanyuk provided no plausible explanation for his presence in the parking lot. Based on the totality of the circumstances, Kilian had reasonable grounds to suspect Slobodyanyuk was car prowling. This unjustifiable and unlawful conduct constitutes breach of the peace. Kilian had lawful authority to apprehend or detain Slobodyanyuk.

Further, even if Kilian lacked probable cause to believe Slobodyanyuk was car prowling, probable cause existed to believe Slobodyanyuk was guilty of second degree possession of stolen property. Under RCW 9A.56.160(1)(a), a person commits second degree possession of stolen property when he or she possesses stolen property exceeding $750 in value. "'Possessing stolen property' means knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto." RCW 9A.56.140(1). Here, Slobodyanyuk's car was filled with valuable electronics, including a flat screen TV, a laptop computer, and a stereo. Considering the totality of the circumstances discussed above, Kilian had

reasonable grounds to suspect Slobodyanyuk was guilty of second degree possession of stolen property—a felony under RCW 9A.56.160(2). Kilian had lawful authority to apprehend or detain Slobodyanyuk. Sufficient evidence supports Slobodyanyuk's third degree assault conviction.

Second Degree Identity Theft

Slobodyanyuk argues that insufficient evidence supports his second degree identity theft convictions because the State failed to prove that he knowingly possessed identification cards, credit cards, or checkbooks or that he intended to use these items to commit additional crimes. The State responds that the totality of the circumstances demonstrates both knowledge and intent.

A person commits identity theft when he or she "knowingly obtain[s], possess[es], use[s], or transfer[s] a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime."[5] RCW 9.35.020(1). Slobodyanyuk possessed identification cards and financial information belonging to three different people. As discussed above, Asya Carducci, Nicola Carducci, and Victoria Overholser each testified that when their identification cards and financial information were stolen, those items were contained in either their wallets or their purses. When Officer Harris found the items in Slobodyanyuk's car, they were scattered in the trunk without the corresponding wallets or purses. The jury could reasonably infer that at some point Slobodyanyuk extracted the items and discarded the

---

[5] First degree identity theft occurs when the accused obtains credit, money, goods, services, or anything else of value in excess of $1,500 in value. RCW 9.35.020(2). Second degree identity theft is identity theft committed under circumstances not amounting to first degree identity theft. RCW 9.35.020(3).

victims' wallets and purses. The jury could also reasonably infer that when Slobodyanyuk discarded the purses and wallets but retained the victims' identification cards and financial information, he intended to use those items to aid, abet, or commit a crime. Viewed in the light most favorable to the State, the evidence indicates that Slobodyanyuk sought out identification and financial information and retained those items while discarding other items. While Slobodyanyuk claimed that he did not know exactly what items were in his car and did not intend to use the items for further criminal activity, we defer to the jury's credibility determinations, which will not be overturned on appeal. The evidence sufficiently supports Slobodyanyuk's second degree identity theft convictions.

### Third Degree Theft

Slobodyanyuk contends that insufficient evidence supports his third degree theft conviction because the State failed to prove he intended to steal Kilian's radio. The State responds that the evidence shows Slobodyanyuk exercised unauthorized control over the radio and failed to return it.

A person commits theft when he or she "wrongfully obtain[s] or exert[s] unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(a). Third degree theft is theft of property or services not exceeding $750 in value. RCW 9A.56.050(1).

Here, Slobodyanyuk fled the Madison Park apartment complex with Kilian's radio inside his car immediately after he assaulted Kilian. Given that the radio was later found on Slobodyanyuk's driver's seat and was turned on to a loud volume, it is

-12-

reasonable to conclude Slobodyanyuk knew it was in his car. No evidence indicates that Slobodyanyuk attempted or intended to return the radio.[6] Slobodyanyuk contends that "Kilian's radio ended up in [his] car, likely because it fell in as the two men struggled" and, thus, "the testimony proved only that [he] ended up with the radio by accident, and had no opportunity to return it before he was stopped by police." Appellant's Br. at 12, 13. We disagree. Even if Slobodyanyuk did not "wrongfully obtain" Kilian's radio, he "exert[ed] unauthorized control" over it when he knowingly kept it in his car, deprived Kilian of its use, and fled the scene without returning the radio. RCW 9A.56.020(1)(a). Viewed in the light most favorable to the State, the evidence sufficiently supports Slobodyanyuk's third degree theft conviction.

## CONCLUSION

Sufficient evidence supports Slobodyanyuk's assault, theft, and identity theft convictions. We affirm.

WE CONCUR:

---

[6] It is also reasonable to conclude that Slobodyanyuk benefited from possessing Kilian's radio, given that he fled the crime scene and prevented Kilian from using the radio to communicate with dispatch.